248 S.W.2d 638 (1952)
ROSEN et al.
v.
ALSIDE, Inc., et al.
No. 42447.
Supreme Court of Missouri, Division No. 1.
April 14, 1952.
Rehearing Denied May 12, 1952.
*639 Jerome B. Stone, Kansas City, for appellant Alside, Inc.
Harold Waxman, Kansas City, Hanna, Hurwitz, Goodman, Stone & Taxman, Kansas City, of counsel, for appellant Sidney M. Mann.
James P. Aylward, George V. Aylward, and Terence M. O'Brien, all of Kansas City, William B. Teasdale, James P. Aylward, Jr., Kansas City, of counsel, for respondents.
VAN OSDOL, Commissioner.
This action was instituted by plaintiffs, Julius Rosen and Loyd K. Parks, individually, and The Guaranteed Roofing and Siding Company, a corporation, against defendants Alside, Inc., a corporation (hereinafter sometimes referred to as "Alside"), and Sidney Mann, an individual, doing business as Home Improvement Company. Plaintiffs' petition declared for $15,000 damages alleged to have been sustained by plaintiffs by reason of a conspiracy to *640 breach an alleged oral contract under which, plaintiffs alleged, they were to become the exclusive dealers in Alside products, principally Alside aluminum siding, in Missouri and Kansas.
The oral contract was stated to have been entered into between defendant Alside and plaintiffs, Rosen and Parks as individuals then doing business as the Guaranteed Roofing and Siding Company. The Guaranteed Roofing and Siding Company was incorporated July 1, 1948, and was alleged to have continued operation under the agreement with Alside's approval. Plaintiffs averred they had duly performed all the conditions of the contract on their part to be performed and had expended large sums in advertising and in training men to handle and sell Alside materials, but that defendant Alside wholly failed to perform its part of the agreement; and that Alside had conspired with defendant Mann to take over from plaintiffs the exclusive dealership, promotion and sale of the Alside product.
Defendants filed separate answers denying the allegations of plaintiffs' petition, and pleaded the Statute of Frauds. Defendant Alside by counterclaim sought the recovery of $272.80 alleged to be the balance due for materials delivered to plaintiffs at their request. A jury found the issues for plaintiffs upon their stated claim, and assessed damages for $13,000; and the jury found for defendant Alside on its counterclaim for $272.80. Defendants have appealed from the judgment for plaintiffs. Plaintiffs have not perfected their appeal from the judgment for defendant Alside.
Defendants-appellants contend the trial court erred in refusing to sustain their motions for a directed verdict. It is urged plaintiffs declared on an express contract, and were erroneously permitted to recover on a theory of quantum meruit; the terms of the alleged contract were indefinite, uncertain, and hence unenforceable; the contract is void for want of mutuality, and is within the purview of the Statute of Frauds; there was no evidence of a conspiracy; plaintiffs committed substantial breaches of the contract and failed to perform the terms and conditions thereof on their part to be performed; and plaintiffs' evidence affords no basis for any award of damages. Defendants-appellants further contend that the trial court erred in the admission of evidence, and in the giving of instructions; and that the verdict was excessive and based on the bias and prejudice of the jury.
In view of our opinion, infra, of the failure of plaintiffs to establish their right of recovery, we shall assume, although we do not decide, that the alleged contract was in its inception in all respects valid and enforceable.
There was evidence introduced tending to show that plaintiffs Rosen and Parks had been partners doing business as The Guaranteed Roofing and Siding Company since 1947 in Kansas City, Missouri. April 4, 1948, after some correspondence following the receipt of a form letter, dated March 2, 1948, which had been circulated by Alside to dealers in building materials in Kansas City, plaintiffs Rosen and Parks went to Akron, Ohio, and interviewed Jerome Kaufman and Lou Manes, respectively president and vice-president of Alside. Having observed examples of the use of Alside siding in the building industry at Akron, plaintiffs Rosen and Parks sought to secure a written contract for the exclusive distribution of the Alside product in the states of Missouri and Kansas. Since the agreement alleged to have been entered into was verbal, we will quote freely from the record the testimony of plaintiff Rosen stating the conversation in Akron with the president of Alside, upon which conversation plaintiffs rely as establishing the terms of the alleged agreement,
" * * * We asked them what they had in mind, whether it was a distributorship or dealership, and they told us they would rather have a dealer here (Kansas City), and I asked them if they planned to give us a written contract if we were able to come to terms. They remarked that the only basis they could give us a written contract *641 was that we take 1,000 square of material a week. (A square in the building-material industry is 100 square feet.) * * *
"Mr. Kaufman told me that, `Now, in order to give you a written contract I would have to give it to you on a basis of 1,000 square of material a week, which is * * * I believe you will agree that it is more, probably, than you can handle at this time, not knowing any more about the product and not having tried it in your area, but we do want to introduce it out there.' And I replied to that answer * * * to the effect that, `Well, now, if we take your product out here, there will be some necessary advertising to it. Now, what do you do in the way of advertising?' and Mr. Kaufman told me that due to the price they were furnishing the merchandise at they could not offer anything in the way of help to help us pay for advertising, but he agreed that advertising was definitely necessary.
"I, in turn, wanted to know, `If we advertise your product, Mr. Kaufman, what will be our protection to help us reap the harvest of what we do build up on this particular product?' and Mr. Kaufman said that, `We will give you protection in your area,' that `if you will go along with us and introduce this product and show us that you are doing a nice job with it,' he said, `we will give you protection.'
"I asked him to qualify his statement of `doing a nice job,' and he volunteered the information to me that in some areas they found it was harder to introduce due to the fact that it was a much higher priced material than had formerly been on the market in the siding fieldthat is, speaking in general termsand in some areas it took hold rapidly; others it was more slowly.
"He suggested, and his definite words were that, `If you will move as much as 100 square a month for the first year, that would possibly be a good showing.' We discussed with Mr. Kaufman, also, the terms of amounts of material to be purchased. He told us that he was quoting a price on the basis of truckload lots, and that price pertained to truckload lots, and that we would be expected to buy in that quantity. We even discussed at the time that we would not guarantee any particular amount because we didn't know just what the product would do, but I pinned Mr. Kaufman down to this statement after I found I definitely couldn't get a written contract.
"We were interested in their product from our standpoint. He told us, volunteered the fact, that he wanted a dealer out here, and so I asked him if we had his definite promise as to the fact that if we exploit this product, bring it out here and advertise it, that `you will give us that protection?' and we discussed from that point the consideration of what might terminate our contract or our agreement together, and he volunteered the fact that `as long as you are doing all right with this product, we will boost you and help you, and we won't interfere with you,' and I wasn't quite satisfied with that particular statement. I wanted something a little more definite because I could see where it would involve some money, and I asked Mr. Kaufman just what he meant by he `would go along with' us and boost us and help us, and he finally made the statement to me that `Before we set up any other dealer in your area we will come to you and discuss it with you if we decide you are not doing the job we feel you should be doing. We will discuss it with you before we make any changes, before we set up any other dealer.' * * *
"In reference to the financial problems, we got along to the point where we were going to make this initial order, and he told us we would be operating on a thirty-day basis. However, this initialit was the spring of the yearhe asked us if we could pay *642 cash for the first order and from that point on, to give them time to investigate our record, and we would be put on a thirty-day basis from that time on."
Upon their return to Kansas City, Missouri, plaintiffs incurred additional operating expenses by employing salesmen; and they began the training of applicators, and advertised the Alside product. One of plaintiffs' salesmen, Balmer, devoted his time exclusively to the sale of Alside siding. Balmer testified that he "ran into" interference with his sales of the siding in Kansas City in August 1948, and in January 1949; and in Pittsburg, Kansas, in September and October 1948. His informants "didn't know * * * what company had been around to see them." A witness, Mrs. Rinehart, testified a salesman representing defendant Mann had solicited her concerning Alside siding. She did not then know "there were two companies." She had been interviewed by Balmer, and asked defendant Mann's salesman "where the other fellow was. He told me he was sick." This was in January 1949. Balmer "sold" between twenty and twenty-five jobs while he worked for plaintiffs. He ceased his efforts when he learned from plaintiffs that they "no longer had the exclusive franchise for Alside."
In June 1948, plaintiff Rosen had again visited Alside at Akron. He asked Alside's president, Kaufman, for more protection, inasmuch as advertising and the training of men as applicators and salesmen were of great expense. Plaintiff Rosen told Kaufman that defendant Mann had representatives contacting plaintiffs' customers. Kaufman replied that defendant Mann "had contacted him, also." Alside's president then showed plaintiff Rosen a telegram, dated March 8, 1948, from Home Improvement Company expressing defendant Mann's interest in handling Alside's siding on an exclusive basis in the Kansas City area. Alside's president, however, told plaintiff Rosen that plaintiffs were then doing "a very nice job and to continue the way we were going."
Plaintiff Rosen testified that plaintiffs had advertised the Alside product in the Kansas City telephone directory; and had advertised the Alside product weekly in the Kansas City Star, a newspaper of general circulation in Missouri and Kansas, from April until August 1948; but during the latter month plaintiffs cut down on expenses due to outstanding debts owed by the corporation. Thereafter, plaintiffs advertised in two newspapers of Kansas City described by plaintiffs as "neighborhood" newspapers. It was "about that time that" plaintiffs ceased ordering any more material from Alside. Plaintiffs testified that Alside products could not be sold without advertising.
Plaintiffs received and paid cash for 300 squares of siding, a truckload quantity, in April of 1948. They ordered and received three 300 squares, truckload quantities, April 29th, June 24th and July 19, 1948. (Plaintiff Rosen testified that plaintiffs arranged with defendant Alside to "cooperate" in the delivery of a further order of 30 squares, which material was delivered on November 1, 1948; this was a "fill in" order of siding of a particular color; the material was to be paid for on a cash basis, and was consigned to plaintiffs, cash on delivery.) The last truckload order for siding was, as stated, on July 19, 1948. On that day the payment for the June balance of plaintiffs' indebtedness to Alside was nine days delinquent. Plaintiffs had paid Alside's statements of monthly balances, substantially as the alleged agreement provided, until June 9, 1948. Thereafter they had become delinquent. They did not pay their balance of account for June until August 4, 1948, which payment left a balance due Alside in the sum of $6,728.80. This balance was reduced by payments on account of $2,728.80, September 7th; $1,200, September 21st; $1,400, October 12th; and $1,000, November 19th, leaving a balance due defendant Alside on that day of $400. Plaintiffs were entitled to and did receive a credit for $127.20 on March 8, 1949, leaving a balance of $272.80 owing to Alside for which sum judgment was rendered *643 on Alside's counterclaim against plaintiffs.
There was evidence tending to show that defendant Alside did enter into an arrangement with defendant Mann whereby defendant Mann was to handle the Alside product in Kansas City and elsewhere. The evidence tends to show this arrangement was entered into in early 1949. It is to be conceded that defendant Mann's salesmen thereafter solicited sales of Alside siding; and as of date February 20, 1949, defendant Mann advertised for applicators experienced in applying Alside siding.
A civil conspiracy is an agreement or understanding between two or more persons to do an unlawful act, or to use unlawful means to do an act which is lawful. Shaltupsky v. Brown Shoe Co., 350 Mo. 831, 168 S.W.2d 1083; Seegers v. Marx & Haas Clothing Co., 334 Mo. 632, 66 S.W.2d 526. Strictly speaking, there has been no distinct form of writ or action of conspiracy; but the action sounds in tort, and is of the nature of an action on the case upon the wrong done under the conspiracy alleged. 11 Am.Jur., Conspiracy, § 53, p. 584; 15 C.J.S., Conspiracy, § 21, pages 1031-1033. The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff. Shaltupsky v. Brown Shoe Co., supra; Medich v. Stippec, 335 Mo. 796, 73 S.W.2d 998; Seegers v. Marx & Haas Clothing Co., supra; Kansas City v. Rathford, 353 Mo. 1130, 186 S.W.2d 570. A combination for the purpose of causing a breach of contract has been held to be an unlawful conspiracy. A person who by conspiring with another or by collusive agreement with him assists him to violate his contract with a third person and to obtain the benefit of that contract for himself commits an actionable wrong. Falstaff Brewing Corporation v. Iowa Fruit & Produce Co., 8 Cir., 112 F.2d 101; Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, and Annotation, 84 A. L.R. 98. Conspiracy does not ordinarily give rise to a civil action unless something is done pursuant to it which, without the conspiracy, would create a right of action against the defendants severally. Shaltupsky v. Brown Shoe Co., supra; Shannon v. Gaar, 233 Iowa 38, 6 N.W.2d 304; 11 Am. Jur., Conspiracy, § 50, p. 582. However, if a plaintiff fails to prove a conspiracy or concerted design, he may yet recover against one or more of the defendants shown to have been guilty of the alleged wrong. Medich v. Stippec, supra.
According to the evidence introduced by defendant Alside, plaintiffs and defendant Alside made no exclusive dealership contractplaintiffs bought 300 squares of siding for cash, and were to pay for any truckload quantities they subsequently ordered on a thirty-day basis. However, considering the evidence from the standpoint favorable to plaintiffs, defendant Alside agreed that plaintiffs should have the exclusive dealership of the Alside product in Missouri and Kansas. Alside was in no way to interfere with the plaintiffs' exclusive dealership as long as plaintiffs were doing a "nice job" in handling and moving the product. If plaintiffs went along with Alside and introduced its product and demonstrated they were doing a nice job of it, plaintiffs were to be given "protection." By protection we may infer it was meant that plaintiffs' exclusive dealership would not be interfered with by any other authorized dealership in the areas of Missouri and Kansas. If plaintiffs moved as much as 100 squares per month for the first year, "that would possibly be a good showing." But in the event Alside should decide plaintiffs were not doing a good job, Alside would discuss the matter with plaintiffs before another dealer was "set up" in the Missouri-Kansas area. This summary of the alleged agreement does not thus far include the reciprocal, material engagements of plaintiffs, as stated by plaintiff Rosen, to advertise and "exploit" defendant Alside's product in the area, and to pay for the product ordered by plaintiffs upon a thirty-day basis.
The obligations of plaintiffs to advertise and to exploit the area, that is, to *644 build up sales of the Alside product in the area, and the stipulation of payment by plaintiffs of statements of their account rendered and payable on the stipulated basis, were material and substantial conditions of the agreement upon which the obligations and duties of Alside were obviously dependent. Upon the substantial nonperformance by plaintiffs of the terms of the alleged agreement, defendant Alside was not guilty of an actionable wrong in seeking other outlets for its product in Missouri and Kansas. Alside in the circumstances was justified in refusing to recognize its contractual duty to plaintiffs. Restatement, Contracts, § 397. No orders were placed with Alside after that of July 19th (save and except the "fill in" 30 squares for which a special arrangement was made for a purchase on a cash basis). The plaintiffs concede that, in August 1948, they curtailed their advertising to the locality of Kansas City. Plaintiffs introduced no evidence tending to show that, during and after the months of July and August 1948, their account was paid in compliance with the agreement. It is to be conceded by plaintiffs that Alside, as early as July 1948, was insisting upon the payment of plaintiffs' delinquent account. Alside's vice-president called plaintiffs by telephone in the month of September or October "in reference to our bills"; the evidence in this respect is further made conclusive by the judgment upon the counterclaim for the balance due Alside. Plaintiffs not only did not prove they had performed their part of the agreement, but their own evidence shows that they probably could not, or at least that they did not perform their part of the agreement. It is the general rule that, where one seeks recovery of damages of one who he alleges has violated the terms of a mutual contract, the plaintiff must allege and prove that he has himself performed or offered to perform terms of the agreement. Zeppenfeld v. Morgan, Mo. App., 168 S.W.2d 971; Childs v. St. Louis Basket & Box Co., Mo.App., 271 S.W. 859; Modern Heating Co. v. Florida Land & Fruit Co., Mo.App., 228 S.W. 1079; Iola Portland Cement Co. v. Ullmann, 159 Mo. App. 235, 140 S.W. 620. See generally 17 C.J.S., Contracts, § 590, pages 1230-1231.
Although it is true, as urged by plaintiffs-respondents, a conspiracy may be proved by circumstantial evidence, State ex rel. Prudential Ins. Co. v. Bland, 354 Mo. 495, 190 S.W.2d 234, there was no evidence introduced justifying the inference defendant Mann knew of the asserted exclusive feature of the alleged exclusive dealership agreement. There is no evidence that defendant Mann actually sought the privilege of selling Alside products, except the telegram of March 8, 1948. Defendant Mann had seen plaintiffs' advertisements, but none of the advertisements in any way represented plaintiffs to be the "exclusive" dealers of the Alside product. We must recall that Alside has taken the position that it had entered into no exclusive dealership agreement with plaintiffs. Mann had been told by Alside that he was authorized to sell Alside's products. So far as the evidence shows, this was after plaintiffs had failed in the performance of their part of the agreement. Defendant Mann should not be held to be guilty of wrongdoing or of wrongful interference with plaintiffs' asserted contract or with plaintiffs' sales or business, especially if he had no knowledge there was any "exclusive" dealership agreement between Alside and plaintiffs. In such circumstances he should be said to have had the legitimate privilege of selling the product in the open and competitive market. Defendant Mann's telegram of March 8, 1948, was insufficient, in itself, of any later agreement or conspiracy to interfere with plaintiffs' sales or to take over plaintiffs' business. Plaintiff Rosen's statement to Alside's president in June 1948 was not substantiated by any proof that defendant Mann's representatives had then in fact been contacting plaintiffs' customers. The telegram of March 8th was no doubt a response to Alside's letter of March 2, 1948, circulated to dealers of building materials in Kansas Citythe same circular to which plaintiffs had responded and which prompted their journey to Akron in April 1948.
*645 We have the opinion plaintiffs failed to make out a case upon their theory of a conspiracy, or upon the theory of the several liability of either defendant.
The judgment for plaintiff should be reversed.
It is so ordered.
LOZIER and COIL, CC., concur.
PER CURIAM.
The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.
All of the Judges concur.