Mary Cox TINDALL, Individually and on behalf of the shareholders of Burger Max, Inc., Plaintiff–Respondent,

v.

Larry K. HOLDER and Cherie L. Jordan, Individually and in their capacities as officers and directors of Burger Max, Inc., and Burger Max, Inc., Defendants–Appellants,

and

Karlyn M. Holder, Counterclaimant/Cross–Appellant.

Nos. 19018, 19033.

Missouri Court of Appeals, Southern District, Division One.

Dec. 21, 1994.

Steven E. Marsh, Hulston, Jones, Gammon & Marsh, Springfield, for defendants-appellants Larry K. Holder and Cherie L. Jordan and counterclaimant/cross-appellant, Karlyn M. Holder.

William L. Mauck, Yates, Mauck, Bohrer, Elliff, Croessmann & Wieland, Springfield, for plaintiff-respondent Mary Cox Tindall.

SHRUM, Chief Judge.

Mary Cox Tindall (Plaintiff) submitted her case to the trial court by a second-amended petition that contained five counts. Plaintiff prevailed on Count IV only, a civil conspiracy count. Count IV seeks damages from Larry K. Holder (Larry)[1] and Cherie L. Jordan (Jordan) for their alleged conspiracy to defraud Plaintiff of her property interests in Burger Max, Inc., a Missouri corporation (Burger Max). On that count, the trial court entered judgment against Larry and Jordan for $1 actual and $25,000 punitive damages.

Larry filed a counterclaim with three counts, only two of which are before us. Count I seeks contribution from Plaintiff, as a co-guarantor, for one-half of the unpaid balance of a promissory note that Larry bought from a Springfield bank. Karlyn M. Holder (Karlyn), not otherwise a party, joins with her husband by a separate pleading in asserting Count I of the counterclaim. The trial court entered judgment for Plaintiff and against both Larry and Karlyn on Count I of their counterclaim.

Count III of the counterclaim is a defamation claim based on statements by Plaintiff about Larry in a letter sent by Plaintiff to Burger Max shareholders. As a pretrial matter, the trial court sustained Plaintiff's motion to dismiss Count III of the counterclaim. It denied Larry's later requests to amend Count III.

In No. 19018, Larry and Jordan appeal from the money judgment against them on Count IV of Plaintiff's action. Larry also appeals in No. 19018 from the judgment that denies him relief on Count I of his counterclaim and the order that dismissed Count III.

In No. 19033, Karlyn appeals from the judgment denying her relief as prayed for in Count I of the counterclaim.

## FACTS

The genesis of this litigation was a fast-food business venture of Plaintiff and Larry known as Burger Max.

The proposal for the business was first made to Plaintiff by Larry in mid-1985. Larry and Karlyn owned land in Springfield, Missouri, on which Larry wanted to open a fast-food drive-through. Larry, however, lacked experience in that type business. Through their earlier business dealings and acquaintanceship, Larry knew Plaintiff was experienced in the restaurant and retail food business and, thus, approached Plaintiff about being a "partner." Plaintiff was interested and her subsequent meetings and discussions with Larry led to the incorporation of Burger Max, Inc.

The articles of incorporation provided for three directors for Burger Max. Although no organizational meeting occurred, Plaintiff testified she understood and agreed that the original directors were herself, Larry, and Jordan; and that the corporate officers were as follows: Larry, president; Jordan, secretary; and Plaintiff, vice-president. Jordan was not an investor or paid employee of

---

1. Without intending disrespect, we refer to Larry Holder and his wife, Karlyn, by their first names. From exhibits bearing Karlyn's signature, we conclude that her name is properly spelled "Karlyn." However, some portions of the record contained the spelling "Karlynn."

Burger Max. She was an employee of American Home Products, Inc. (AHP), a firm owned by Larry that sold cookware and related merchandise. Jordan was also an employee of AHP Acceptance Inc. (AHP Acceptance), another firm owned by Larry. AHP Acceptance financed consumers' purchases from AHP.

At first, Plaintiff and Larry were the only investors, each putting in approximately $23,000. Conflicting evidence abounds about the agreed division of shares regarding voting. Plaintiff insisted at trial that the division as originally agreed was 50/50, whereas Larry maintained it was 51 percent for him, 49 percent for Plaintiff. Plaintiff's stock certificate was not delivered to her until September 1987 by which time this suit had been filed and people other than Plaintiff and Larry had invested in Burger Max.

Except for a September 1987 shareholder meeting, the shareholders and directors of Burger Max never held a formal meeting at which minutes were taken, corporate resolutions adopted, or other business formally voted on or recorded. Major corporate decisions for Burger Max were made informally, either by Larry acting alone or at frequently held meetings between Larry and Plaintiff. Once the restaurant building was constructed, Plaintiff was employed by Burger Max and given full management responsibilities over the restaurant.

The restaurant building was completed and opened in May 1986. It was constructed on land owned by Larry and Karlyn and leased to Burger Max by them. Larry was the only officer or director who signed the lease on behalf of Burger Max. The lease term was ten years with an option for one additional ten-year period. Rental was $1,500 per month for the first three years with provision for increasing the rent thereafter. The lease provided that upon default in the payment of rent, the Holders could terminate the lease and take possession of the premises.

The money required to build and equip the restaurant came primarily from a $200,000 loan made to Burger Max by Empire Bank.

As security, Burger Max pledged its restaurant equipment, fixtures, and inventory. As additional security, Larry and Karlyn gave Empire Bank a second deed of trust on the restaurant building site and on their AHP real estate. They also pledged the Burger Max lease. Finally, to enable Burger Max to obtain the loan, Larry and Karlyn signed an agreement guaranteeing the payment of Burger Max's loan. Plaintiff signed a loan guaranty agreement identical to that signed by the Holders.

From the beginning, the restaurant struggled financially. Consequently, by July 1986, Burger Max had to borrow money to operate or Plaintiff and Larry had to put more money in it. At Larry's suggestion—with which Plaintiff did not disagree—Burger Max began borrowing from Larry's finance company, AHP Acceptance. By December 1986, Burger Max had borrowed $45,000 from AHP Acceptance. As with all other transactions, this borrowing occurred without formal board approval or authorization. The instrument evidencing Burger Max's $45,000 debt to AHP Acceptance was signed, "Larry K. Holder, President Burger Max, Corp." and "Mary L. Cox,[2] Vice President Burger Max, Corp." That document required Burger Max to repay the loan in 120 monthly payments. However, the loan document had no acceleration clause, i.e., no provision by which AHP Acceptance could declare any unpaid balance due if Burger Max defaulted in making payments.

In 1986, Larry and Plaintiff first discussed franchising Burger Max stores and selling stock in a public offering. Eventually they decided to sell stock to others, and as their first step, hired an attorney to represent them. As we describe some of the events occurring after the decision to "go public," we note that directors and officers of Burger Max continued to act informally without minutes, formal votes, or records. Moreover, Plaintiff denied both participation in and prior knowledge of some actions we now describe.

In March 1987, Burger Max's articles of incorporation were amended to increase its

2. Mary L. Cox was Plaintiff's name before she married in 1987.

authorized capital stock and its board of directors to seven. Four additional directors were "selected" for Burger Max. A prospectus for Burger Max was prepared, additional stock certificates were printed, and the solicitation of investors began. By early summer 1987, new investors had paid approximately $180,000 for Burger Max stock. New investor money was not deposited in Burger Max's operating account but, rather, in a new account where only Larry or Jordan could withdraw it.

On June 17, 1987, a check for $43,644.80 was drawn on the new investor account to pay off Burger Max's loan to AHP Acceptance. Although Burger Max's account with AHP Acceptance was delinquent, the loan document lacked an acceleration clause. Larry offered evidence that the prepayment occurred upon the advice of Burger Max's accountant, i.e., to "clean up" the prospectus. Plaintiff testified she knew nothing of the prepayment to AHP Acceptance until after it occurred and never agreed that Burger Max should prepay.

By July 1987, relations between Plaintiff and Larry had deteriorated. On August 6, 1987, Larry terminated Plaintiff's employment at Burger Max and ordered her off the premises.

On September 3, 1987, a formal shareholder meeting was held. At that meeting all new shareholders were offered an opportunity to withdraw their investment and most did. Burger Max continued to operate the restaurant until it was finally closed in late December 1987 or early January 1988.

Burger Max's lease was terminated by Karlyn in September 1987 for nonpayment of rent. Burger Max defaulted on the loan from Empire Bank and when not otherwise paid by co-guarantors, Larry and Karlyn bought the note along with the security instrument in January 1988. They foreclosed and sold the collateral. Larry and Karlyn paid $10,000 for items not bought by outside buyers. After the proceeds of the sale were applied, the balance on the Burger Max note was $160,150.

In early 1988, a newly formed corporation called Speedy's, Inc., rented the Burger Max building from Larry and Karlyn and opened a drive-through restaurant at that site. Some equipment formerly owned by Burger Max was used by Speedy's, Inc. Both Larry and Jordan were shareholders in Speedy's. That store was also unsuccessful financially and closed within two to three months.

The litigation that evolved from the Burger Max venture and its outcome follows. In Plaintiff's five-count second amended petition, Count I was an "action for fraud" against Larry Holder. It recited various conduct by Larry that Plaintiff alleged was part of his scheme to (1) defraud her of her interest in Burger Max, (2) place de facto control over Burger Max in Larry, and (3) transact the affairs of Burger Max for Larry's gain and benefit and to the exclusion of Plaintiff. Although it describes Larry's conduct in some detail, only once does Count I allege a representation that was false and relied upon by Plaintiff. That allegation concerned Larry's representation that he and Plaintiff would each own equal stock in Burger Max.

Count II was a "shareholder's derivative action" against Larry and Jordan, "individually" and "as officers and directors of Burger Max, Inc.," and Burger Max, Inc. It charged that Larry and Jordan breached their fiduciary duties to Burger Max and to Plaintiff as a shareholder, describing numerous acts and omissions complained of. It sought their ouster as directors and asked for an accounting of corporate funds allegedly wrongfully diverted to Larry.

Count III was an "action for tortious interference with contract" and sought damages from Larry for interfering with Plaintiff's employment with Burger Max.

Count IV is "plaintiff's claim for damages based on civil conspiracy" brought against Larry and Jordan. It incorporates all allegations from Counts I, II, and III, and then charges that Jordan and Larry conspired to "control and conduct the affairs of BURGER MAX, INC. as to wrongfully deprive or interfere with Plaintiff's property interests therein."

Count V was Plaintiff's "claim for relief pursuant to Section 351.485 R.S.Mo." in

which she sought liquidation of the assets and business of Burger Max.

Only on Count IV did Plaintiff prevail. Count I was ruled against Plaintiff, as follows:

"Count I of the Petition is ruled against Plaintiff for the reason that the Court has concluded that there was no agreement to have equal shares of the corporation at the time of the original incorporation and Plaintiff reported an unequal distribution to the Internal Revenue Service. Thus, there was no fraud as alleged."

Count II was found abandoned, therefore moot. Plaintiff lost on Count III because the trial court found that, as president of Burger Max, Larry had authority to discharge her as an employee. Count V was found to have been abandoned by Plaintiff. Regarding Count IV, the trial court findings included the following:

"The Court believes Defendant Larry K. Holder had a motive to protect personal financial interests at the expense of Plaintiff and to gain tactical advantage in disputes. In carrying out his motive, the Court has concluded the responsibilities of a director and officer of corporations and of loan guarantor were breached. Those breaches form the basis for the conclusions expressed in the Judgment.

. . . .

The Court concludes that Defendant Larry K. Holder conspired with Defendant Cherie Jordan to preserve the financial interests of Defendant Larry K. Holder and to preserve favorable tactical advantage over Plaintiff in disputes, which then served ultimately to defeat Plaintiff's financial interests in Burger Max, Inc.

. . . .

Plaintiff failed to establish substantial damages with sufficient certainty. For that reason, Plaintiff is only awarded judgment in a nominal sum against Defendants of One Dollar ($1.00). However, as punishing damages the Court awards to Plaintiff the sum of $25,000 against Defendant Larry K. Holder . . . ."

Of the counterclaim counts, two are before us. In Count I, Larry seeks contribution from Plaintiff as a co-guarantor for one-half of the unpaid balance on Burger Max's loan with Empire Bank. Karlyn filed a separate pleading to join with Larry seeking contribution from Plaintiff. Count III charges that Plaintiff damaged Larry by defamatory statements in her letter to shareholders sent shortly before the September 3, 1987, meeting.

The trial court denied Larry and Karlyn's claim for contribution under Count I, concluding that "[u]nder all the circumstances and evidence ... it would be unfair and unjust to permit enforcement of an implied duty to share losses." Count III was dismissed by a pretrial order that sustained Plaintiff's motion to dismiss.

Plaintiff does not appeal from any part of the judgment. Larry and Jordan appeal from the judgment against them on the conspiracy count. By separate appeals, Larry and Karlyn appeal from the judgment denying their claim for contribution. Larry appeals from the order dismissing Count III and the order refusing his request to amend that count.

## APPEAL OF LARRY AND JORDAN— CIVIL CONSPIRACY JUDGMENT— NO. 19018

Larry and Jordan's first point contains multiple subpoints in which they argue that Plaintiff failed to both plead and prove her Count IV claim of civil conspiracy. As Point I(F) is dispositive, we confine our discussion to it.

Under Point I(F), Larry and Jordan assert that the trial court erred when, after finding that Plaintiff "failed to establish substantial damages with sufficient certainty," it nonetheless awarded Plaintiff $1 nominal and $25,000 punitive damages. They argue that actual pecuniary loss is an intrinsic element of a conspiracy to defraud and that nominal damages are not sufficient to supply that essential element. Accordingly, they say that Plaintiff's failure to prove that she sustained actual pecuniary loss defeats her case and that the trial court misapplied the law when it concluded that nominal damages supplied the required "damage" element.

■ In Missouri, as in many jurisdictions, causes of action are divided into those that require proof of pecuniary damages as an element of the action and those that do not. For causes of action in which pecuniary damages are not an element, nominal damages can generally be awarded.

■ Nominal damages are damages awarded only as a recognition of some breach of a duty owed by defendant to plaintiff and not as a measure of compensation for loss or detriment suffered. *Simpkins v. Ryder Freight Systems, Inc.,* 855 S.W.2d 416, 422[7] (Mo.App.1993). The general theory of nominal damages is that they should be allowed where a legal right has been invaded but no actual damages were suffered or proven. *Id.* at 422[8]. The principle developed from the common law action for trespass for violence to person or property. *Id.* In such cases, the law simply presumes that damages are allowed. *Id.*

■ Contrarily, nominal damages cannot be awarded in certain tort cases where pecuniary damages are an element of the cause of action. Why this division or distinction exists has been explained as follows:

"As the law of torts expanded by means of the action on the case to cover wrongs not characterized by violence and breach of the peace but by fraud, deceit, inattention, carelessness, and the like, more emphasis was placed upon the plaintiff's loss, and in certain of the wrongs which came to be remedied by actions on the case it was established that a vital and necessary element of the plaintiff's case was a showing of actual loss or detriment to him flowing from defendant's wrongful conduct."

C. McCormick, Handbook on the Law of Damages § 22 (1935).

■ In Missouri, pecuniary loss is an intrinsic element of an action sounding in fraud or deceit, *Collins v. Adams Dairy Co.,* 661 S.W.2d 603, 606[3] (Mo.App.1983), and "[p]roof of substantial injury and damage is essential to recovery in an action for fraud and deceit." *Dolan v. Rabenberg,* 360 Mo. 858, 231 S.W.2d 150, 155[4] (1950).

"[As opposed to] trespass and other direct injuries for which [a plaintiff] is awarded nominal damages if he should fail to plead and prove actual damage, deceit belongs to that class of tort of which pecuniary loss constitute a part of the cause of action." *Lammers v. Greulich,* 262 S.W.2d 861, 864[3] (Mo.1953). *See McCall v. Jim Lynch Cadillac, Inc.,* 791 S.W.2d 456, 458[7] (Mo.App. 1990); *Harris v. Penninger,* 613 S.W.2d 211, 214[1] (Mo.App.1981); *Jurcich v. General Motors Corp.,* 539 S.W.2d 595, 600–01[5] (Mo. App.1976).

■ Here, Plaintiff captioned Count IV of her second amended petition as a "Claim For Damages Based on Civil Conspiracy." A "civil conspiracy" is generally defined to be an agreement between two or more persons to do an unlawful act or a lawful act in an unlawful manner. *Rosen v. Alside, Inc.,* 248 S.W.2d 638, 643[1] (Mo.1952). "Strictly speaking, there has been no distinct form of writ or action of conspiracy; but the action sounds in tort, and is of the nature of an action on the case upon the wrong done under the conspiracy alleged." *Id.* at 643[2]. Civil conspiracy is not itself actionable in the absence of an underlying wrongful act or tort. *Williams v. Mercantile Bank of St. Louis,* 845 S.W.2d 78, 85[15] (Mo.App.1993). "'The gist of the action consists, not in the conspiracy, but in the damage inflicted in pursuance thereof.'" *Shaltupsky v. Brown Shoe Co.,* 350 Mo. 831, 168 S.W.2d 1083, 1086[3] (1943) (quoting *Epps v. Duckett,* 284 Mo. 132, 223 S.W. 572, 575[4] (1920)).

The trial court concluded that the gravamen of Count IV was conspiracy to defraud. In that, we agree. Although the wholesale incorporation of Counts I, II, and III into Count IV makes the allegations somewhat confusing, the gist of Count IV is that Larry and Jordan conspired to deprive Plaintiff of her interests in Burger Max through fraud or deceit, as where wrongdoers by fraud have seized control of a corporation from a complaining stockholder or have breached special fiduciary duties. *See Gieselmann v. Stegeman,* 443 S.W.2d 127, 131[2] (Mo.1969). The allegations of Count IV sound in tort, i.e., conspiracy to defraud, and are not grounded in any theory developed through the common law action for trespass for violence to person or property.

■ As with fraud and deceit cases, a plaintiff in a conspiracy to defraud case must plead and prove pecuniary damages because damages are an intrinsic element of such a cause of action. *Rippe v. Sutter*, 292 S.W.2d 86 (Mo.1956). In *Rippe*, the plaintiff's claim of conspiracy did not involve fraudulent misrepresentations. Rather, she alleged that defendant and another had conspired to defraud plaintiff of her real estate and then carried out their scheme by instituting and maintaining two lawsuits that resulted in void judgments against her. An issue on appeal was whether Rippe's claim was barred by a five-year statute of limitations. After observing that the period of limitation begins to run in a civil conspiracy case when the last overt act charged results in damage to plaintiff, the *Rippe* court said:

"We have the view that an indispensable element of the [conspiracy to defraud] claim asserted by plaintiff was her sustention of damage. As we see it, plaintiff had no claim or cause of action against defendant until and unless the wrongful institution and maintenance of the suits resulted in damage to her. That must be true, because, irrespective of how fraudulent or wrongful defendant's acts in causing the institution and maintenance of the suits may have been, no right of plaintiff was violated unless defendant's acts of institution and maintenance proximately contributed to cause her not to receive property that was rightfully hers. *So that in this action, as in actions for fraud and deceit, Lammers v. Greulich, Mo., 262 S.W.2d 861, 864[2][3][4], pecuniary loss constituted an indispensable part of the [conspiracy to defraud] claim asserted by plaintiff.*"

*Id.* at 90–91[15] (emphasis ours). *See also Adkison v. Hannah*, 475 S.W.2d 39, 42 (Mo. 1972).

■ We conclude from *Rippe* that the trial court erred in declaring or applying the law when, after determining that Plaintiff had failed to establish that she suffered any actual damages, it awarded nominal damages for an alleged conspiracy to defraud. *See also Lammers*, 262 S.W.2d 861; *Harris*, 613 S.W.2d 211. Based upon Plaintiff's failure to prove any actual damages in her action for

conspiracy to defraud, it follows that she was not entitled to an award of punitive damages. *McCall*, 791 S.W.2d at 459[9]; *Adams Dairy*, 661 S.W.2d at 606[3]. Under the circumstances, the trial court erred in awarding nominal damages of $1 and punitive damages for $25,000.

■ In so holding, we do not ignore the trial court's finding that in some part, Plaintiff's inability to prove damages was due to the conspiratorial conduct of Larry and Jordan. Plaintiff argues that the trial court's finding about the "state" of the business records relieves her of proving what our supreme court has said is an indispensable part of her cause of action, i.e., proof that she sustained pecuniary loss. A sufficient answer to that argument is that the difficulty in proving an element of a cause of action does not dispense with the necessity of making proof. *Bank of Kirksville v. Small*, 742 S.W.2d 127, 132 (Mo. banc 1987). We reject Plaintiff's argument to the contrary.

Finally, we note Plaintiff's argument that there was sufficient evidence in the record to justify an award of pecuniary damage. We decline, however, to consider or further discuss that argument. This is because Plaintiff did not appeal from the judgment awarding nominal damages and thereby waived any claim that the trial court erred by not awarding pecuniary damages.

The judgment of the trial court awarding Plaintiff nominal and punitive damages in No. 19018 is reversed.

### LARRY'S APPEAL—COUNT I OF COUNTERCLAIM—NO. 19018

■ Initially we note that appellate review is limited to those issues presented in an appellant's points, *Pruellage v. De Seaton Corporation*, 380 S.W.2d 403, 405[3] (Mo. 1964); *Don L. Tullis & Associates, Inc. v. Gover*, 577 S.W.2d 891, 893[2] (Mo.App.1979), and this portion of our opinion should be so viewed.

Count I of Larry's counterclaim sought contribution from Plaintiff for one-half of the unpaid balance on the Burger Max note acquired by Larry and Karlyn from Empire Bank. Larry's claim is based on the fact

that Plaintiff is a co-guarantor of the note. On appeal from denial of that claim, Larry assigns trial court error as follows:

III. The Trial Court erred in entering judgment for plaintiff and against Defendant Larry K. Holder and counterclaimant Karlyn M. Holder on Count I of their counterclaim because:

(1) Plaintiff did not effectively plead any defense or affirmative defense to the counterclaim in that only conclusions, rather than facts, were pled;

(2) The trial court's own findings establish the counterclaimants' right to a judgment on Count I and the failure of Count IV of plaintiff's petition eliminates Tindall's only potential defense;

(3) Tindall's "defenses" as to Count I were in the nature of a set-off rather than an affirmative defense and, therefore, would not extinguish the counterclaim.

This point and the argument in its support bespeak a misconception about why the trial court denied Count I of Larry's counterclaim. To illustrate, in his brief Larry says:

"The trial court ruled against the Counterclaimants on Count I ... because of the finding in favor of Tindall on Count IV of her Petition.

. . . .

There is nothing in the Trial Court's findings to indicate the Counterclaimants were denied relief on Count I of their Counterclaim for any reason other than the fact the Trial court found and entered judgment in favor of Tindall on Count IV of her Petition.

As previously argued, the judgment against Holder and Jordan on Count IV of Tindall's Petition should be reversed. If it is reversed, the Trial Court's own findings indicate Tindall will be stripped of her only 'defense', being 'inseparable,' to the Count I Counterclaim."

Such arguments ignore what the record shows. In its detailed memorandum the trial court said Larry lost because (1) his cause of action was based on a general theory of

contribution, (2) recovery on such theory is grounded in equitable principles, (3) his conduct may have caused the default of Burger Max, Inc., or did decrease the amount that would have otherwise been available from the assets of Burger Max to help pay the debt guaranteed by Plaintiff, and (4) under the circumstances, ordering contribution by Plaintiff would be inequitable.[3] The trial court's findings wholly discredit Larry's contention that he lost because the trial court ruled Plaintiff's civil conspiracy claim favorably to her.

█ Larry cites no authority in support of his argument, but relies only on this trial court memorandum language:

"Count IV of the Petition and Count I of the Counterclaim will be discussed together. In Count IV of the Petition Plaintiff alleges damages because of a conspiracy to defraud her of her property and Plaintiff makes the same allegations as a defense to Count I of the Counterclaim, which is an action to share a corporate debt to The Empire Bank. These issues are inseparable."

Such reliance is misplaced. Although Plaintiff's factual allegations are essentially the same in both cases, the allegations serve a different purpose in each case and are advanced in support of different theories. Whether Plaintiff's allegations and proof were sufficient in her conspiracy to defraud case, has no bearing on whether the same allegations and proof were sufficient to support her defense to Larry's claim for contribution. *See* Restatement of the Law of Security § 161 (1941), comment (a).

█ The general doctrine of contribution is not founded on contract, but is based on the principle of equality in bearing a burden, that is, wherever there is a common right the burden is also common. *Missouri District Telegraph Co. v. Southwestern Bell Telephone Co.,* 338 Mo. 692, 93 S.W.2d 19, 23[8] (1935); 18 Am.Jur.2d *Contribution* § 1, p. 7–8 (1985). The doctrine of contribution finds its basis in general principles of equity

---

**3.** Rather than burden this opinion with a recital of the trial court's lengthy findings and conclusions as to why it found Holders were not enti-

tled to contribution, we place the relevant part of the trial court's memorandum in Appendix A at the end of the opinion.

**324**

and of natural justice, not contract. *Commercial Union Insurance Co. of New York v. Farmers Mutual Fire Insurance Co. of St. Louis County*, 457 S.W.2d 224, 226[3] (Mo.App.1970). It is to be applied when one is compelled to pay more than his share of a common obligation that several persons are obligated to discharge. *State ex rel. McCubbin v. McMillian*, 349 S.W.2d 453, 460[8] (Mo.App.1961). *Cf. In re Jamison's Estate*, 202 S.W.2d 879, 883[2, 3] (Mo.1947) (held that "principles of natural equity" gave rise to a right of subrogation in a guarantor who paid the indebtedness of a principal debtor).[4]

A cause of action for contribution exists for a surety or guarantor who discharges more than his proportionate share of the principal's debt and then seeks contribution from his fellow sureties or guarantors. *Stearns Law of Suretyship* § 11.18 (5th ed.1951); Restatement of the Law of Security § 149 (1941); 38 C.J.S. *Guaranty* § 115 (1943). *Cf. In re Estate of Wray*, 842 S.W.2d 211, 214[5] (Mo.App.1992) (a maker who pays an instrument is entitled to contribution from other co-makers). When contribution is compelled in co-guarantor cases, it is on the basis of an equitable obligation, i.e., that a court should undertake to require parties so related to do that which they ought to do. *Stearns Law of Suretyship* § 11.18 (5th ed. 1951). 38 C.J.S. *Guaranty* § 115 (1943); 38 Am.Jur.2d *Guaranty*, § 128 (1968). *Cf. In re Jamison's Estate*, 202 S.W.2d at 883[2, 3].

As the right to contribution depends upon equitable principles, it is a right that may be lost by a wrongful or negligent act by a co-guarantor. 18 Am.Jur.2d *Contribution* § 8 (1985). "Equity requires that 'where one of two or more obligors in suretyship aids in the commission of a default by the principal, either by his negligence or his active misconduct, he cannot assert a claim in contribution.' " *Collins v. Throckmorton*, 425 A.2d 146, 149[2] (Del.1980) (quoting *Stearns Law of Suretyship* § 11.24 (5th ed. 1951)). The Restatement of the Law of Restitution § 81

(1936) also takes the view that the right to contribution is not absolute.

"Unless otherwise agreed, a person who has discharged more than his proportionate share of a duty owed by himself and another as to which, between the two, neither had a prior duty of performance, is entitled to contribution from the other, *except where the payor is barred by the wrongful nature of his conduct.*" (Emphasis ours.)

In a similar vein, the Restatement of the Law of Security § 161 (1936), reads:

"Where the conduct of a surety causes the default of the principal or cosurety or decreases the amount that would otherwise have been available from the principal or a cosurety, his right to contribution from the cosureties is proportionately diminished.

*Comment:*

a. The right to contribution depends upon equitable principles. If the conduct of a cosurety is responsible for increasing the ultimate liability of another cosurety, it would be inequitable to allow him to recover as much as would otherwise have been allowed. *Conduct which will reduce the amount a cosurety can recover is not necessarily fraudulent.*" (Emphasis ours.)

Turning to Larry's points, we discuss and rule them within the framework of the trial court's unchallenged findings that (1) Larry's cause of action is based on the doctrine of contribution, and (2) Larry's conduct and the consequences thereof were such that he should be denied co-guarantor contribution from Plaintiff.

*Point III(1)—Sufficiency of Pleading of Affirmative Defense*

Larry's Point III(1) is that Plaintiff did not sufficiently or factually plead an affirmative defense to Count I of the counterclaim. The claim is that only conclusions, not facts, were pled.

Rule 55.07 requires that "[a] party shall state in short and plain terms his de-

---

4. "The [subrogation] doctrine is one of equity and benevolence, *and like contribution* and similar equitable rights, was adopted from the civil law, and its basis is the doing of complete, essential, and perfect justice between all the parties without regard to form, and its object is the prevention of injustice." *Landmark Bank v. Ciaravino*, 752 S.W.2d 923 (Mo.App.1988) (citing *State Sav. Trust Co. v. Spencer*, 201 S.W. 967, 969[1] (Mo.App.1918)).

fenses to each claim." Rule 55.08 requires that a party "plead ... 'matter constituting an avoidance or affirmative defense.'" *Gee v. Gee,* 605 S.W.2d 815, 817[3] (Mo.App.1980). Finally, Rule 55.11 requires that "[a]ll averments of claim or defense ... shall be limited as far as practicable to a statement of a single set of circumstances." Such rules contemplate that in pleading affirmative defenses, their factual basis must be set out in the same manner as is required for pleading claims. *ITT Commercial Finance v. Mid-Am Marine,* 854 S.W.2d 371, 384 (Mo. banc 1993). The purpose of such rules is to give notice to the opposing parties in order to be prepared on the issues. *Schimmel Fur Co. v. American Indemnity Co.,* 440 S.W.2d 932, 939[11] (Mo.1969).

Here, Plaintiff's answer to Larry's counterclaim contains the following:

"5. ... Further answering Paragraph 5, Plaintiff states she failed and refused to cooperate with Defendant [in paying off one-half of the amount guaranteed] for the following reasons:

(a) That the corporation was or would have been able to pay said promissory note but for the wrongful acts and/or ommissions [sic] of Larry K. Holder who was in defacto control of the corporation having wrongfully excluded the Plaintiff; and

. . . .

(c) That Defendant negligently operated and managed the corporation's business affairs after wrongfully excluding Plaintiff so as to put Burger Max, Inc. into a position where it was unable to meet its obligations and/or intentionally did same so as to become the owner of the corporation's assets without paying fair consideration therefor and to allow him to pursue the spurious action complained of in this Counterclaim.

. . . .

6. Plaintiff ... further answers by stating that Defendant's actions [in purchasing Burger Max's note from Empire Bank and receiving an assignment of the collateral including the loan guarantees] were done solely in furtherance of his scheme to defraud Plaintiff and/or commit

acts oppressive to Plaintiff as a minority shareholder as complained of in Plaintiff's Petition....

. . . .

12. Further answering Count I of Defendant's Counterclaim, Plaintiff states that Defendants' complaints as therein stated are nothing more than actions on his part which are part and parcel of Defendant's scheme to defraud Plaintiff and Burger Max, Inc. and constitute oppression of Plaintiff as a minority Shareholder of Burger Max, Inc. and as such, Defendant cannot and should not be allowed to recover upon this or any other theory presented to this Court which seeks a contribution from Plaintiff as a personal guarantor of the promissory note to Empire Bank.

. . . .

15. Further answering Count I of Defendant's Counterclaim, Plaintiff avers that Defendant is not entitled to contribution or indemnity from Plaintiff herein upon the grounds that he is not entitled to such relief as result of his own wrongful acts, more fully described in the Second Amended Petition herein."

■ Rule 55.12 reads: "Statements in a pleading may be adopted by reference ... in another pleading." Pursuant to that rule, we treat the factual allegations in Plaintiff's second amended petition as part of Plaintiff's affirmative defense allegations. So viewed, Plaintiffs allegations were pled with the level of specificity required by our pleading rules. They were sufficient to notify Larry of the issues, i.e., Plaintiff's claim that he was not entitled to contribution because of his wrongful acts, therein described, and thus allow him to prepare.

■ Finally, we believe that Larry waived his claim that Plaintiff's affirmative defense was insufficiently pled. A claim that an affirmative defense has not been pled with the particularly required by Rule 55.08, is waived if not raised by motion of the opposing party. *See Walters Auto Body v. Farmers Insurance Company,* 829 S.W.2d 637, 640[1] (Mo.App.1992); *McGuire v. Bode,* 607 S.W.2d 165, 167[4] (Mo.App.1980). As Larry

never presented the particular issue to the trial court, we treat Plaintiff's affirmative defense as properly pled. *Walters Auto Body,* 829 S.W.2d at 640[1]. Point denied.

*Point III(2)—Denial of Count I, Larry's Counterclaim*

Larry's second point is that when the trial court ruled against Plaintiff on her Count I claim for fraud, such finding "eliminate[d] [Plaintiff's] only defense." Larry argues that "[t]here is nothing in the Trial Court's findings to indicate the Counterclaimants were denied relief on Count I of their Counterclaim for any reason other than the fact that the Trial Court found and entered judgment in favor of [Plaintiff] on Count IV of her Petition."

■ A sufficient answer to this argument is that it is factually unfounded. As earlier discussed in detail, the trial court denied Larry's claim for contribution based upon its finding that Larry's conduct—not necessarily fraudulent conduct—may have caused the default of Burger Max *and* did decrease the amount that would have otherwise been available to Plaintiff to recoup her losses. Based upon those findings, the trial court concluded that it would be inequitable for Larry to recover as he would otherwise have been allowed. Larry challenges neither the findings made nor the conclusions reached by the trial court in denying his claim for contribution. His Point III(2) simply ignores what the trial court said. Point denied.

*Point III(3)—Affirmative Defense or Set-off*

Larry's Point III(3) is that the affirmative allegations in Plaintiff's answer to Count I asserted a set-off, at most, and not an affirmative defense that would extinguish the counterclaim if the allegations were found to be true.

■ An affirmative defense declares that even if the allegations in the plaintiff's petition are proven, the plaintiff cannot prevail because additional facts exist which avoid the legal responsibility of the defendant. *Rodgers v. Czamanske,* 862 S.W.2d 453, 459[11] (Mo.App.1993). An affirmative defense

seeks to defeat or avoid the plaintiff's cause of action. *Id.*

■ In a general sense, a set-off was a remedy employed by a defendant to discharge or reduce the plaintiff's demand by an opposite one arising from a transaction which is *extrinsic* to a plaintiff's cause of action. *Edmonds v. Stratton,* 457 S.W.2d 228, 232 (Mo.App.1970). Likewise, recoupment goes to mitigation or extinguishment of plaintiff's damages but permits of no affirmative judgment for the defendant. *Id.* The former remedy of set-off and common law recoupment have lost considerable identity in modern practice and now are included within the remedy of a counterclaim. *Id.* A counterclaim is a cause of action in which a party seeks a judgment on his own behalf. *McDowell v. Schuette,* 610 S.W.2d 29, 36[7] (Mo.App.1980).

■ The affirmative allegations in Plaintiff's answer do not seek a judgment on her behalf but, rather, are directed to defeating Larry's cause of action because of his conduct. Her answer for the most part admits her status as a co-guarantor and her refusal to contribute but affirmatively pleads the existence of additional facts, i.e., Larry's conduct, which, if proven, extinguished Larry's cause of action or, at the least, diminished his recovery thereunder. Contrary to Larry's arguments, Plaintiff's affirmative allegations state an affirmative defense, not set-off or recoupment. Point denied.

The judgment denying Count I of Larry Holder's counterclaim is affirmed.

## LARRY'S APPEAL FROM DISMISSAL OF DEFAMATION COUNT—NO. 19018

Point II has two components. In part, it charges that the trial court erred in dismissing Count III of Larry's counterclaim (defamation) because "Count III as originally filed ... sufficiently stated a cause of action." We disagree.

Larry's effort to plead the defamatory words used in Plaintiff's letter took the following form:

"1. On or about the 20–25th day of August, 1987, ... Plaintiff ... caused a

letter to be sent generally to all stockholders of Burger Max, Inc., which letter is not now available to, [sic] and which letter contained among other things the following statements: *Statements, the exact words of which are not now recalled by us* but which were to the effect that Larry ... had testified under oath that he had spent Burger Max corporate funds to cover personal fees that he owed Ted VonWiller, Jr., to cover fees for a personal divorce action, or that Defendant [Larry] had appropriated corporate funds to pay off his own personal obligations." (Emphasis ours.)

 To state a cause of action for libel, a plaintiff must make his allegations *in haec verba,* or in the exact words alleged to be defamatory. *Lorenz v. Towntalk Pub. Co.,* 261 S.W.2d 952, 953[1] (Mo.1953). *See also Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 313[11] (Mo. banc 1993). The reason for the rule is explained thusly:

"Libel is usually published through easily reproducible means such as a writing, printing, broadcast, or electronic communication. Thus, in a libel case *it is not unreasonable to expect a verbatim reproduction of the offending statement to assist the court in determining whether it is capable of defamatory meaning.*"

*Nazeri,* 860 S.W.2d at 313 (emphasis ours).

Clearly, Larry's petition did not set out the very words published as required by the rule stated in *Lorenz* and approved in *Nazeri.* The trial court did not err when it dismissed Count III for "[f]ailure to quote the defamatory statement." This part of Point II is denied.

Point II also charges that the trial court erred when it denied Larry the opportunity to file an amended claim. Larry cites no authority to support this argument except Rules 55.33 and 67.06. And Larry misstates Rule 67.06 when he says: "The Civil Rules prohibit dismissal of pleadings without the opportunity to amend. Rule 67.06."

 Rule 67.06 provides that "[o]n sustaining a motion to dismiss a claim ... the court shall freely grant leave to amend." In a similar vein, Rule 55.33(a) says, "Leave [to amend] shall be freely given when justice so requires." Although both rules stress liberality in allowing amendments to pleadings, they do not give a party an absolute right to file even a first amended petition. *Baker v. City of Kansas City,* 671 S.W.2d 325, 329[7] (Mo.App.1984). Whether to allow a party to amend his pleading is a matter for the discretion of the trial court, with which we are not disposed to interfere. *Dye v. Division of Child Support Enforcement,* 811 S.W.2d 355, 358[5] (Mo. banc 1991). "Denial of leave to amend is within the sound discretion of the trial court, and its decision will not be disturbed unless there is a showing that such court palpably and obviously abused its discretion." *Rushing v. Southern Missouri Bank,* 859 S.W.2d 211, 223[11] (Mo.App. 1993).

Larry's second point does not present the issue of whether the trial court abused its discretion in denying leave to amend. Issues not presented in points to be argued in an appellate brief are abandoned and will not be considered by the reviewing court. *Green v. Miller,* 851 S.W.2d 553, 554[2] (Mo.App. 1993).

Even if the argument portion of Larry's brief is liberally read as presenting the abuse of discretion issue, it is without citation of any reported case authority. And, Larry's brief does not indicate that citations of authority are unavailable.

 Points relied on must be supported with citations of authority thereunder. Rule 84.04(d). If the claim of error is one for which precedent is appropriate and available, an appellant has the obligation to cite relevant authority if he expects to prevail on appeal. *Inman v. Reorganized School Dist. No. II,* 845 S.W.2d 688, 694[4] (Mo.App.1993). If the claim of error is one for which it does not appear that precedent for or against the point is available, an appellant should so state, with an explanation of why citations are unavailable. *Id.* at 694[5]. "The requirements of Rule 84.04(d) are mandatory." *Id.* at 694[6]. A point of error left unsupported by a citation of relevant authority is deemed abandoned. *Id.* at 694[7]. We consider this part of Point II abandoned.

The judgment of dismissal of Count III of Larry's counterclaim is affirmed.

## KARLYN HOLDER'S APPEAL—COUNT I OF COUNTERCLAIM—NO. 19033

Karlyn's Point I(1) is dispositive of her appeal. It charges that the trial court erred in denying her claim for contribution because Plaintiff failed to plead an affirmative defense to her claim. She asserts that as all the necessary elements of her claim were found and established by the trial court and no affirmative defense thereto was pled, the judgment should be reversed. Her point has merit.

When Karlyn first filed a pleading to join in her husband's counterclaim for contribution, Plaintiff had already answered Larry's counterclaim. That answer addressed affirmatively only the conduct of Larry and Jordan. It made no allegation that Karlyn's conduct adversely affected the rights of either the principal, Burger Max, or co-guarantors.

■ When answering Karlyn's counterclaim, Plaintiff did not charge Karlyn with misconduct. She incorporated only the allegations of her earlier reply to Larry's pleading. Without the caption and signatures, Plaintiff's answer to Karlyn's counterclaim reads:

> "COMES NOW, Plaintiff and for her Answer to the Counter Claim of Karlynn M. Holder adopts the admissions, denials and averments set forth in *Plaintiff's Answer to CounterClaim by Defendant Larry K. Holder,* previously filed herein, as if the same were set forth here in haec verba."

By pleading in this manner, Plaintiff failed to include a single affirmative allegation of conduct by Karlyn that allegedly caused the default by Burger Max, Inc., or decreased the amount that would have otherwise been available from Burger Max, Inc.

After specifically listing certain affirmative defenses, Rule 55.08 provides that a party must plead "any other matter constituting an avoidance or affirmative defense." "If a defendant intends to raise a defense based on facts not included in the allegations neces-

sary to support the plaintiff's case, they must be pled under Rule 55.08." *Shaw v. Burlington Northern, Inc.,* 617 S.W.2d 455, 457[2] (Mo.App.1981). A defense, which contends that even if the petition is true, a plaintiff cannot receive the relief sought because there are additional facts which place defendant in a position to avoid legal responsibility, must be set forth in a defendant's answer. *Id.* Such is the defense at issue here and Plaintiff was obliged to plead it affirmatively. Rule 55.08. This she has failed to do.

"Generally, failure to plead an affirmative defense results in waiver of that defense." *Detling v. Edelbrock,* 671 S.W.2d 265, 271[17] (Mo. banc 1984); *Lucas v. Enkvetchakul,* 812 S.W.2d 256, 263 (Mo.App.1991). Clearly, Plaintiff recognized the need to plead additional facts which would have allowed her to avoid legal liability as to Karlyn because she pled the matter affirmatively in her answer to Larry's pleading. Based on long standing rules of pleading, Plaintiff waived her "inequitable conduct" defense as to Karlyn unless (1) Karlyn either implied or expressly consented to trying the case on that defense, or (2) the trial court permitted the pleadings to be amended to include the defense. Rule 55.33(b).[5] *See Lucas,* 812 S.W.2d at 263.

■ Consent to the trial of nonpleaded affirmative defenses should not be inferred unless it clearly appears that the party against whom the defense is asserted tacitly agreed to join issues on such defenses. *Lucas,* 812 S.W.2d at 263[12]. Moreover, "[w]hen evidence is relevant to an issue already in the case, and there is no indication at trial that the party who introduced the evidence was seeking to raise a new issue, the pleadings will not be amended by implication or consent." *Gee,* 605 S.W.2d at 817[2].

Here, evidence of how Burger Max's assets were lost and who ultimately owned its property was relevant on the issues of whether Larry defrauded or conspired to defraud Plaintiff. Consequently, Plaintiff introduced evidence in her case that Karlyn (1) as a co-owner, signed the Burger Max real estate lease prepared by Larry, (2) joined with Lar-

---

**5.** We find no trial court ruling in the record allowing amendment to include the defense.

ry in demanding and receiving possession of Burger Max's building after Burger Max defaulted, (3) received an ownership interest in the Burger Max note and its security after Larry negotiated its assignment from Empire Bank, and (4) received an ownership interest in some of Burger Max's personal property upon foreclosure of the security instruments. There is nothing in the record to show that evidence of Karlyn's conduct was offered for any purpose other than to support Plaintiff's claims against Larry. We conclude that Karlyn did not impliedly or expressly try her counterclaim on the defense of inequitable conduct by a co-guarantor.

■ As the defense was not pled to Karlyn's claim, it was waived and unavailable for use by the trial court to defeat her claim for contribution. *State v. Davis*, 830 S.W.2d 27, 30 (Mo.App.1992); *McNulty v. Heitman*, 600 S.W.2d 168, 173 (Mo.App.1980). The trial court erroneously applied the law in using an unpled affirmative defense to defeat Karlyn's cause of action for contribution.

■ We reverse in No. 19033. We remand on the issue of damages only.[6]

In summary, the judgment of the trial court is affirmed in No. 19018 except it is reversed as to the award of nominal and punitive damages to plaintiff. The judgment of the trial court in No. 19033 is reversed and remanded on the issue of damages only.

FLANIGAN and GARRISON, JJ., concur.

## APPENDIX A

Excerpt from trial court's judgment relating to contribution:

"This action on the Loan Guaranty Agreement is an action for contribution from a co-guarantor. From the pleadings, it appears that was the theory intended by Counterclaimants. This is also apparent from the demand of Counterclaimants for approximately $80,125 from plaintiff.

The claim for contribution is based upon an implied promise to share, with co-guarantors, the losses from the failure of Burger Max, Inc. to pay the guaranteed debt. There is also an implied promise by each co-guarantor to protect any security there may be for the debt and to protect any ability to recoup losses from the principal debtor, because a paying guarantor has the rights of the obligee against the principal debtor, under subrogation theories.

This action fails on the theory of contribution, because Counterclaimants improperly and in violation of their responsibility to Plaintiff dissipated and lost the security for the Burger Max, Inc. note and the assets of Burger Max, Inc. They did this by taking the equipment, location and cash on hand of Burger Max, Inc. and using the same for their own purposes. Before the sale of the collateral, they already planned to use or were using the equipment and building to operate the business of the separate corporation, called Speedy's Inc. In addition, before Burger Max, Inc., went into default for nonpayment of installments on the Empire Bank note, Defendant Larry K. Holder, as President of Burger Max, Inc., arranged for substantial payments to his separate corporation, A.H.P. Acceptance Inc., which was wholly owned by him. The debt was not due and payable. In the absence of those payments to A.H.P. Acceptance Inc., Burger Max, Inc. may have remained solvent and the default for nonpayment on the Empire Bank note may not have occurred.

The manipulation of corporate assets and funds was done without a corporate meeting or resolution of Board of Directors or Shareholders and most of it was done without prior knowledge by Plaintiff or while she was excluded from corporate affairs. It was done while defendant Larry K. Holder owed a high fiduciary duty to the corporation called Burger Max, Inc. The Court finds and believes the actions were taken to gain financial advantage and tactical advantage over Plaintiff in litigation and disputes.

---

6. We reject Karlyn's suggestion that we reverse outright and enter judgment against Plaintiff. As there were three co-guarantors, factual issues may remain about Plaintiff's proportionate share of (1) the principal debt, (2) interest (if any), and (3) attorney fees (if any). By mentioning possible issues, we do not imply that they are the only possible damage issues that might arise.

In the beginning, there was no formal corporate authority for the officers of Burger Max, Inc. to enter into a lease with an officer. Such authority is especially important, in the context of the claim of Counterclaimants for contribution, because as it turns out the lease, by its terms permits the lessors to take the capital improvements without compensating the corporation in the event of default.

The court finds the lease was prepared and executed by Defendant Larry K. Holder on behalf of Burger Max, Inc. without prior discussions with or knowledge of Plaintiff. Then Defendant Larry K. Holder manipulated cancellation of the lease, surrendered possession of the real estate and cancelled the Deed of Trust on the real estate on which the Burger Max building was constructed in two inconsistent capacities without memorializing the transactions in the corporate structure and without prior authority of the Board of Directors or Shareholders of Burger Max, Inc. or of Plaintiff as a co-guarantor. Thus, the principal asset of Burger Max, Inc., the principal debtor on the guaranteed note, is lost to co-guarantors Larry K. Holder and Karlynn M. Holder and is no longer available to Plaintiff to recoup her losses on the guaranty.

Under all the circumstances and evidence, the Court concludes that it would be unfair and unjust to permit enforcement of an implied duty to share losses. Because of the actions of Defendant Larry K. Holder and Counterclaimant Karlynn M. Holder, the amount of damages resulting to Plaintiff because of the violation of their duties to Plaintiff cannot be determined. Therefore, a precise assessment of equities and a determination of a fair rate of contribution cannot be made. To avoid an unjust enrichment of Counterclaimants, under the circumstances of this case, the Court is compelled to deny any claim for contribution among co-guarantors."