Robert CARTER, M.D., Plaintiff–
Appellant–Cross–Respondent,

v.

**ST. JOHN'S REGIONAL MEDICAL
CENTER, Defendant–Respondent–
Cross–Appellant.**

Nos. 24247, 24248.

Missouri Court of Appeals,
Southern District,
Division One.

July 25, 2002.

Motion for Rehearing and Transfer Denied
Aug. 22, 2002.

Application for Transfer Denied
Sept. 24, 2002.

2

L. Thomas Elliston, Webb City, James R. Spradling, Carthage, for appellant.

James Bandy, Horn Aylward & Bandy, LLC, Kansas City, for respondent.

KENNETH W. SHRUM, Presiding Judge.

This damage suit by Dr. Robert L. Carter ("Dr. Carter") against St. John's Regional Medical Center ("St. John's") was submitted to the jury as a breach of contract claim and a claim of tortious interference with business expectancy. The trial court would not submit Dr. Carter's claim for punitive damages to the jury. The jury awarded Dr. Carter compensatory damages on both claims, and St. John's appeals from the judgment entered on those verdicts. Dr. Carter also appeals and claims the trial court erred by not submitting his punitive damage claim to

the jury. The trial court did not err in its refusal to give a punitive damage instruction with the contract claim. We affirm the judgment for Dr. Carter for compensatory damages on his breach of contract claim; we reverse the judgment for Dr. Carter on his tort claim and remand for further proceedings.

### STATEMENT OF FACTS

Dr. Carter graduated from medical school in 1966 and ultimately became a board-certified pathologist. In 1981, Dr. Carter left private practice to work for Scripps Clinic and Research in California. Scripps did work in "clinical hematology-oncology for the advanced treatment and diagnosis of cancer and allied diseases." While working there, Dr. Carter became a specialist in hematology-oncology and received training in bone marrow transplants. Dr. Carter explained that this field was then "literally exploding."

In 1982, Dr. Carter was asked to travel to Joplin, Missouri, to speak on the topic of bone marrow transplants.[1] Part of Dr. Carter's visit to Joplin included a tour of St. John's and discussions with the administration about joining their emerging cancer center. At that time, no doctor at St. John's had training in the area of bone marrows, and Dr. Carter's fellowship at Scripps Clinic was scheduled to end June 30, 1983.

After his initial discussions with St. John's about locating in Joplin, Dr. Carter applied for active privileges, both clinical and procedural, as an oncologist/hematologist in St. John's department of medicine and family practice. He also applied for consulting privileges in pathology. His initial application was dated October 20, 1982. Dr. Carter explained that he viewed privileges in the pathology department as "absolutely essential" in the care and treatment of a cancer patient.

In June 1983, Richard Hammer ("Hammer"), vice president of St. John's, called Dr. Carter in California, and during the conversation, they agreed Dr. Carter would withdraw his request for pathology privileges, and his "main area of service [would] be hematology-oncology . . . and in that framework be able to perform and officially report bone marrows[.]" After the conversation, Dr. Carter immediately transcribed a letter and sent it to Hammer in which Dr. Carter described their discussion and agreement. As explained more fully below, this letter and other documents prepared by St. John's form the basis of Dr. Carter's claim that he had a contract right to officially "report bone marrow" test results and charge therefor.

Sometime after June 30, 1983, Dr. Carter began a private practice in Joplin, Missouri, and began using the hospital's facilities in connection with his practice. From 1983 to 1997, Dr. Carter continued to report on bone marrow aspirations and had an excellent relationship with the pathology laboratory at St. John's. For example, he testified that pathology lab personnel at St. John's often did the technical preparation of slides for him, and he had performed close to 3,000 bone marrows "since I've been here."

This relationship deteriorated in September 1997. Dr. Carter claimed the collapse was due to his discovery of many instances of misdiagnoses by the lab, and his complaints about this perceived problem. St. John's then informed Dr. Carter he should not remove pathology slides from the hospital premises as he had done

---

1. Scripps Clinic was then one of only twenty institutions in the United States doing bone marrow transplants.

in the past. In explanation, St. John's stated such practice violated their policies. Dr. Carter also testified that St. John's and the lab would not allow him to view the pathology slides when he would actually go to the hospital. Finally, on October 14, 1997, St. John's informed Dr. Carter via letter that although he was a board-certified pathologist, he did "not have privileges to practice this speciality at St. John's."

When Dr. Carter ultimately sued St. John's, he alleged that St. John's actions, as recounted above, amounted to a breach of their contract by which he had the right to officially report on bone marrows. At trial, he presented evidence that he had lost business profits in 1997 through 2000 because of this alleged breach of contract.

Also, because of the antagonism between the hospital and him, Dr. Carter claimed other doctors who were associated with St. John's stopped referring patients to his office. According to Dr. Carter, this resulted in a decrease in his patient load and a decline in profits for his practice. This allegation was the primary basis of Dr. Carter's suit against St. John's for tortious interference with his practice. To prove damages on this claim, Dr. Carter hired an expert witness, Thomas Beisner ("Beisner"), and directed him to "look at changes in [Dr Carter's] practice over the ... years[ ]" and form some opinions with regard thereto. Dr. Carter directed Beisner to make his analysis by calculating what profits Dr. Carter lost in 1996, 1997, and 1998, due to the decrease in patient referrals by certain physicians (twenty in number) as named by Dr. Carter. Beisner testified this loss was $261,000. This figure was then used to predict future lost profits allegedly caused by St. John's interference with Dr. Carter's practice.

Dr. Carter sued St. John's in late 1997 and ultimately went to trial on a breach of contract count and a claim of tortious interference with his practice. The jury returned a verdict of $1.0 million on the contract count and $1.5 million on his tort claim.

In No. 24247 St. John's appeals from the judgment rendered on these verdicts. In No. 24248, Dr. Carter appeals, charging that the trial court erred when it refused to submit his claim for punitive damages to the jury.

*ST. JOHN'S APPEAL—No. 24247*

### Point I: Submissible Case: Breach of Contract?

St. John's first point claims there was insufficient evidence to support the jury verdict and resultant judgment on the contract count. Specifically, St. John's claims the evidence did not "support a finding that [Dr. Carter] and [St. John's] reached a binding agreement for medical staff privileges in that: (A) medical staff privileges cannot be granted or agreed to by a hospital employee; (B) there was no consideration or mutuality of obligation for the alleged contract; and (C) the agent of [St. John's] with whom [Dr. Carter] reached the alleged agreement [Hammer] had no authority to enter into a contract for medical staff privileges."

■ The essential elements of a contract are: (1) competency of the parties to contract; (2) proper subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. *Baris v. Layton*, 43 S.W.3d 390, 396[13] (Mo.App.2001).

■ In its brief, St. John's never questions the "proper subject matter" element of Dr. Carter's alleged contract with St. John's. Specifically, neither St. John's point nor the argument beneath it addresses the question of whether (a) hospital

privileges could properly be the subject of a contract via formal action of the Board, or (b) Board, by its conduct, could ratify an unauthorized contract for privileges made by its agent. By not briefing the "subject matter" element, St. John's waives any claim about it as a submissibility issue.

■ To make a submissible case in a breach of contract suit, substantial evidence must support every fact essential to liability. *Gateway Exteriors, Inc. v. Suntide Homes, Inc.*, 882 S.W.2d 275, 279[2] (Mo.App.1994). The questions of whether the evidence is substantial and whether the inferences drawn are reasonable are questions of law. *Id.* at 279[4]. In determining if Dr. Carter made a submissible case, we view the evidence in the light most favorable to him, presume his evidence is true, and give him the benefit of all reasonable and favorable inferences to be drawn from the evidence. *Eidson v. Reproductive Health Services*, 863 S.W.2d 621, 626[3] (Mo.App.1993).

■ As we understand prong (A) of St. John's first point, it contends there was no mutuality of agreement because "[a]s a matter of law, medical staff privileges can only be granted to a physician by the governing body of the hospital[,]" and, according to St. John's, Dr. Carter presented no evidence that St. John's board of directors ("Board") agreed to the contract or even had any knowledge of it. To support the argument, St. John's points to the evidence adduced by Dr. Carter that the alleged contract was negotiated between Hammer (who had no authority to bind the Board) and him.

The contract claimed by Carter is found in a letter written by Dr. Carter to Hammer in which he set out the agreement he made with Hammer in their June 15, 1983, telephone call and in a handwritten note by Hammer on Dr. Carter's delineation of

privileges form. Hammer's notation was confirmatory of Dr. Carter's letter, i.e., that Carter's "privileges to do bone marrows [as a hematologist and oncologist] includes the right to report same on oncology patients."

The facts that led to the Carter/Hammer agreement include the following. When Dr. Carter applied to St. John's in October 1982 for consulting privileges in pathology, Ferguson Medical Laboratories, Inc. ("Ferguson"), had the right (via contract with St. John's) to do all pathology work at that hospital and officially report the results thereof. Consequently, although St. John's fully approved Dr. Carter's initial request for hematology-oncology privileges in the department of medicine and family practice, it did not approve his request for consulting privileges in the pathology department. Instead, St. John's wrote Dr. Carter on June 9, 1983, and requested he complete a "[d]elineation of [p]rivileges form for the Department of Pathology" so that it might know the "specific pathology privileges [he] desire[d]." Dr. Carter never returned the form as requested, but negotiated with Hammer concerning his pathology privileges. After their discussion, Dr. Carter wrote his June 15, 1983, letter and Hammer put the notation on Dr. Carter's privilege form, and thus (according to Dr. Carter), established Dr. Carter's contractual right to officially *report the results* of bone marrow procedures he performed on his patients at St. John's.

As stated above, St. John's has not challenged Dr. Carter's implicit assertion that staff privileges can be the subject of a binding contract between Dr. Carter and it. Consequently, we analyze Point I based on principles of corporation, agency, and contract law. We do so, while also acknowledging the general rule upon which St. John's relies, i.e., that Board had

ultimate authority to grant a physician staff privileges at the hospital. *See, e.g., Paskon v. Salem Memorial Hosp. Dist.,* 806 S.W.2d 417, 425 (Mo.App.1991); *Dillard v. Rowland* 520 S.W.2d 81, 89 (Mo. App.1974); 19 C.S.R 30–20.021.

■ St. John's is a corporation. As such, " '[it] is an artificial being, and as an entity it must act through an agent.' " *Ritter v. BJC Barnes Jewish Christian Health Systems,* 987 S.W.2d 377, 384[5] (Mo.App.1999) (quoting *Standard of Beaverdale, Inc. v. Hemphill,* 746 S.W.2d 662, 663 (Mo.App.1988)). The power of a corporate officer, like that of any other agent, to bind his or her corporation in contract ordinarily rests either upon such officer's actual authority or upon his or her apparent authority. *Rizzo Motors, Inc. v. Central Bank of Kansas City,* 825 S.W.2d 354, 358[7] (Mo.App.1992); *Parks v. Midland Ford Tractor Co.,* 416 S.W.2d 22, 26 (Mo. App.1967).

We agree with St. John's that the evidence here is insufficient for a finding that Hammer had actual authority to contract on behalf of St. John's for Dr. Carter to officially report his bone marrow results. Nor do we find sufficient evidence exists from which a reasonable person could have believed that Hammer had actual authority to make such a contract without board approval. What we do find in this record, however, is sufficient evidence to support a finding that St. John's ratified Hammer's unauthorized act.

■ Ratification is an adoption or confirmation upon full knowledge of the facts by one entity of an act (such as entering into a contract) performed on that entity's behalf by another without authority. *Springfield Land and Dev. Co. v. Bass,* 48 S.W.3d 620, 628[7] (Mo.App.2001). "Ratification relates back and is the equivalent of authority at the commencement of the act." *Newman v. Schiff,* 778 F.2d 460,

467 (8th Cir.1985). " 'Probably the most certain evidence of implied ratification is the acceptance and retention of the fruits of the contract with full knowledge of the material facts of the transaction.' " *American Multi–Cinema, Inc. v. Talayna's N.W., Inc.,* 848 S.W.2d 557, 560 (Mo.App. 1993) (citation omitted). "Where an unauthorized act of an agent of a corporation is clearly beneficial to the corporation, presumption of ratification will arise from slight circumstances." *Washington Sav. Bank v. Butchers' & Drovers' Bank,* 107 Mo. 133, 17 S.W. 644, 646 (1891).

Here, substantial evidence exists from which a jury could find that St. John's accepted and retained the fruits of the contract for over fourteen years. For example, there is evidence that Dr. Carter moved to the Joplin area in 1983 and "join[ed] St. John's ... blossoming oncology program[ ]" and after that continuously "provide[d] good medical service." At first, Dr. Carter located his practice in St. John's as part of its "Hospital Oncology Service." After working four months in the hospital, Dr. Carter opened a separate, private practice. However, he moved his practice back to the hospital in 1984 after he was "approached by St. John's ... that we should come back and be on campus, or they would find competition for [him and his associates]." Dr. Carter stayed "inhouse" at St. John's until 1991, during which period he helped build the hospital's new oncology center. In 1991, he moved out of the hospital and into an independent practice, yet continued to admit, treat, and see cancer patients at St. John's until 1997.

Moreover, although St. John's denied it had full knowledge of "the material facts of [Hammer's] transaction" with Carter or that Carter claimed a contractual right to report on bone marrows of his patients, substantial evidence exists from which a jury could find otherwise. First, St.

John's president, acting for the Board, wrote Dr. Carter on July 26, 1983, that his requested privileges had been approved by the Board. The attachment accompanying that letter contained Hammer's notation confirming Dr. Carter's right to report out on bone marrows he performed on his patients. On August 18, 1983, the Board specifically acknowledged Dr. Carter's appointment as delineated on the form. That form included Hammer's notation that Dr. Carter could report on bone marrows as part of his staff membership as an oncologist/hematologist.

Second, Dr. Carter presented evidence that from mid–1983 through October 1997, he routinely reported on the bone marrows obtained from his patients at St. John's. He did this though at least one "Delineation of Privileges" form subsequently prepared by Dr. Carter and approved by St. John's did not have language that entitled him to do so. Dr. Carter also testified St. John's "had to be aware[ ]" he had analyzed and reported on bone marrows he had taken from his patients since 1983. For example, Dr. Carter asserted he had done "probably 3000 marrows" during that period. Often, he used the technicians in St. John's pathology lab to prepare slides of his patients' bone marrows. Moreover, for each patient he wrote three reports, all of which were filed as part of each patient's medical record at St. John's. The foregoing is more than the "slight circumstances" required to raise the presumption of ratification, *Washington Sav. Bank,* 17 S.W. at 646, and are facts from which the jury could reasonably infer the Board ratified the contract made between Hammer and Dr. Carter. Because "[r]atification relates back and is the equivalent of authority at the commencement of the act[,]" *Newman,* 778 F.2d at 467, St. John's complaint regarding lack of Board approval fails.

■ Under prong (B) of this point, St. John's alleges there was no consideration or mutuality of obligation for the alleged contract. In its argument, St. John's focuses on Dr. Carter's agreement to withdraw his request for pathology privileges. It asserts this was an illusory promise and cannot be legal consideration. If his promise to withdraw his request for pathology privileges was the only consideration supporting the contract, then we might be inclined to agree. However, St. John's ignores the additional consideration as revealed by the record, i.e., Dr. Carter's promise to move from California and join the staff at St. John's.

■ In bilateral contracts, consideration is a return promise. *State ex rel. Miller v. St. Louis Union Trust Co.,* 335 Mo. 845, 74 S.W.2d 348, 356 (1934). "It has been stated over and over again that consideration sufficient to support a simple contract may consist of a detriment to the promisee or a benefit to the promisor, and it is sufficient if either exists." *Wells v. Hartford Accident and Indem. Co.,* 459 S.W.2d 253, 260[10] (Mo.banc 1970). This consideration may consist of some right, interest, profit, or benefit accruing to one party, or some forbearance, loss, or responsibility given, suffered, or undertaken by the other party. *Perbal v. Dazor Mfg. Corp.,* 436 S.W.2d 677, 697[55] (Mo.1968). Consideration may be found if a promisee in reliance on a new promise changes his or her position. *Guild Management Co. v. Oxenhandler,* 541 S.W.2d 687, 691[2] (Mo. App.1976).

St. John's promised to allow Dr. Carter to officially report out the results of the bone marrow analysis performed by him on his patients at St. John's. Dr. Carter stated this right was absolutely essential to his practice as a hematologist/oncologist (from an economic standpoint and for his patients' welfare), and he would not have

moved to Missouri unless assured of this right. This promise was a benefit to Dr. Carter. In return, Dr. Carter promised to practice in Joplin, be on St. John's staff, and relocate his entire family from California to Missouri. At the time, Dr. Carter was employed with Scripps Clinic which was one of only twenty institutions in the United States to do bone marrow transplants in 1983. The field of cancer treatment and cancer research was exploding then. There was no doctor at St. John's that had any training in the area of bone marrows. Dr. Carter's promise to relocate to Missouri and join the staff at St. John's was undoubtedly a benefit to the hospital. These mutual promises were sufficient consideration. Point I(B) is denied.[2]

Under prong (C) of Point I, St. John's alleges the evidence was insufficient because it "failed to establish that Richard Hammer had the authority to grant [Dr. Carter] medical staff privileges." Our decision under prong (A) resolves this question adversely to St. John's. Point I(C) is denied.

### Point II: Damage Issue: Contract Count

■ We reproduce St. John's second point relied on as follows:

"THE TRIAL COURT ERRED IN OVERRULING [ST. JOHN'S] MOTION FOR DIRECTED VERDICT AT THE CLOSE OF ALL THE EVIDENCE, AND FURTHER ERRED IN OVERRULING [ST. JOHN'S] MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, ON [DR. CARTER'S] CLAIM FOR BREACH OF CONTRACT BECAUSE [DR.

CARTER'S] EVIDENCE WAS INSUFFICIENT TO SUPPORT A FINDING THAT [DR. CARTER] SUSTAINED DAMAGES AS A DIRECT RESULT OF [ST. JOHN'S] BREACH OF THE ALLEGED AGREEMENT FOR MEDICAL STAFF PRIVILEGES IN THAT [DR. CARTER'S] EVIDENCE OF DAMAGES WAS VAGUE, SPECULATIVE AND CONFLICTING AND THE DAMAGES CLAIMED WERE NOT SHOWN TO BE WITHIN THE CONTEMPLATION OF THE ALLEGED CONTRACTING PARTIES."

Initially, we note St. John's, in structuring its "motion for directed verdict at the close of all evidence," did not include a complaint that Dr. Carter failed to present sufficient proof of damages to make a submissible case. To the contrary, the motion alleged St. John's had immunity from civil suit due to Dr. Carter's agreement to follow the corporate bylaws, there was insufficient consideration to support the contract, and Hammer did not have the authority to bind St. John's. The first appearance of St. John's allegation of error as contemplated by its second point arises in its motion for judgment notwithstanding the verdict.

■ A motion for judgment notwithstanding the verdict is a motion to have judgment entered according to the motion for directed verdict. *Hatch v. V.P. Fair Foundation, Inc.*, 990 S.W.2d 126, 137[20] (Mo.App.1999). An issue not raised in a motion for a directed verdict may not be used to seek a judgment notwithstanding

---

**2.** We do not ignore *Fenberg v. Goggin*, 800 S.W.2d 132 (Mo.App.1990), cited by St. John's when arguing Dr. Carter's promises were illusory. If, as St. John's posits, Dr. Carter's only promise was that he would withdraw his application for consulting privileges while retaining the right to renew the application at any time he chose to do so, then *Fenberg* may well require a finding that such promise was illusory. *Id.* at 136. We have already explained, however, there was mutuality of obligation here created by other promises. This factual distinction renders *Fenberg* inapposite as controlling authority.

the verdict on that issue or for obtaining appellate review of the trial court's denial of the j.n.o.v. on that ground. *Daniels v. Board of Curators of Lincoln Univ.*, 51 S.W.3d 1, 6[9] (Mo.App.2001). St. John's has not preserved this alleged error for review.

▉ Even if the error had been properly preserved, St. John's second point would fail for an additional reason. When St. John's raised the alleged deficiency of "lack of damage proof" in the j.n.o.v., it conceded that "[a] judgment notwithstanding the verdict is appropriate only when a claimant has not made a submissible case" and cited *Fabricor, Inc. v. E.I. DuPont de Nemours & Co.*, 24 S.W.3d 82, 93 (Mo.App. 2000), for that proposition. With that concession made, St. John's argued to the trial court and now to this court (at least implicitly) that proof of pecuniary damages is an essential element of a breach of contract claim. St. John's is simply wrong in making that claim.

▉ In Missouri, it is a fundamental precept of contract law that "nominal damages are available where a contract and its breach are established." *Dierkes v. Blue Cross and Blue Shield*, 991 S.W.2d 662, 669 (Mo.banc 1999). Stated otherwise, proof of the existence of a contract and its breach make a submissible case on damages, no matter whether actual damages have been proven. *Wasson v. Schubert*, 964 S.W.2d 520, 526 (Mo.App.1998); *Kozeny–Wagner, Inc. v. Shark*, 709 S.W.2d 149, 152[4] (Mo.App.1986).

In Point I, we found that a contract existed. St. John's has never claimed there was not a breach of the contract.[3]

Because the existence of the contract and its breach are the necessary requirements for submissibility, *Wasson*, 964 S.W.2d at 526, the trial court did not err in denying St. John's motions for a directed verdict and judgment notwithstanding the verdict. Point II is denied.

### Point III: Submissible Case: Business Expectancy Interference?

St. John's third point advances multiple reasons why Dr. Carter failed to make a submissible case on his claim for tortious interference with contract or business expectancy. Dr. Carter, on the other hand, maintains that St. John's misconceives the nature of his claim. Dr. Carter characterizes his claim as "interference with a professional practice[,]" which he says is a "completely different tort" than tortious interference with a business relationship or expectancy. He insists that the elements and proof are different; that based on *Cowan v. Gibson*, 392 S.W.2d 307 (Mo. 1965), he did not have to prove all elements of an ordinary "tortious interference with contract or business expectancy" case; and that St. John's is simply wrong when it argues otherwise.

In *Cowan*, a physician sued two doctors and a hospital, and claimed they had conspired to interfere with his contractual rights with his patients. The trial court dismissed the suit, but on appeal our supreme court found the allegations sufficient to state a cause of action. 392 S.W.2d at 308–10. In so deciding, the court quoted *Willis v. Santa Anna Community Hosp. Assoc.*, 58 Cal.2d 806, 26 Cal.Rptr. 640, 376 P.2d 568, 570 (1962), as follows: "There is an established principle

---

**3.** St. John's has never raised the issue either at trial or on appeal that the contract was terminable at will by either party. *See, e.g., Knox County Court v. Benson*, 706 S.W.2d 215, 217[2] (Mo.App.1985) (holding a contract for indefinite period may be terminated at the will of either party; the only requirement is that the terminating party give reasonable notice). *See also Albers v. Cardinal Glennon Children's Hosp.*, 729 S.W.2d 519, 523 (Mo.App.1987).

at common law that an action will lie where the right to pursue a lawful business, calling, trade, or occupation is intentionally interfered with either by unlawful means or by means otherwise lawful when there is lack of sufficient justification." From this, Dr. Carter claims a new cause of action was recognized, and that the elements thereof are a professional practice, an intentional interference with the practice by unlawful means or lawful means without justification, and damages (actual or nominal). Dr. Carter's assertion of a new cause of action is incorrect.

The *Willis* court, in making its pronouncement about the common law, cited, *inter alia*, the RESTATEMENT OF TORTS, § 766(b) (1939). That section merely stated the general rule that "one who, without a privilege to do so, induces or otherwise purposely causes a third person not to . . . enter into . . . a business relationship with another is liable to the other for the harm caused thereby." Based on the *Cowan* court's approval of the Willis case and the *Willis* court's reliance on the RESTATEMENT, we conclude that Dr. Carter's claim is not a special cause of action with different elements than a tortious interference with contract or business relationship or expectancy. Dr. Carter was required to plead and prove those elements; therefore, we must decide if he did so.

 Tortious interference with a contract or business expectancy requires proof of five elements: (1) a contract or valid business expectancy; (2) the alleged interferer's knowledge of the contract or relationship; (3) an intentional interference by the alleged interferer inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages. *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 408[1] (Mo.App.1996) (citing *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo.banc 1993)); *Commu-*

*nity Title Co. v. Roosevelt Fed. Sav. and Loan Ass'n*, 796 S.W.2d 369, 372[4] (Mo. banc 1990). To prevail on this tort claim, a party must adduce substantial evidence supporting each and every element. *21 West, Inc. v. Meadowgreen Trails, Inc.*, 913 S.W.2d 858, 870 (Mo.App.1995).

 St. John's Point III(A) maintains the first element was not proven because Dr. Carter's "evidence failed to establish the existence of a contract or valid business relationship between [Dr. Carter] and any patient or referring physician." Two reasons exist why this argument fails.

In Missouri, a reasonable *expectancy* of a commercial relationship is protected from unjustified interference, *Downey v. United Weatherproofing*, 363 Mo. 852, 253 S.W.2d 976, 980[5] (1953), and there is no requirement that the business be based upon a valid contract. *Cook v. MFA Livestock Ass'n*, 700 S.W.2d 526, 529 (Mo.App. 1985). The *Downey* court, relying on the RESTATEMENT OF TORTS, §§ 766–68 (1939), and also many earlier authorities, explained that a tortious interference claim can be based on an "unjustified interference with reasonable *expectancies of commercial relations even where an existing contract is lacking*." 253 S.W.2d at 980[5] (emphasis supplied). The RESTATEMENT (SECOND) OF TORTS, § 766B (1979), with which Missouri cases are in accord, *Cook*, 700 S.W.2d at 529, provides that "[o]ne who intentionally and improperly interferes with another's *prospective* contractual relation (except a contract to marry) is subject to liability. . . ." (Emphasis supplied.)

Based on the foregoing, we hold Dr. Carter did not have to plead or prove a business relationship to make a submissible case for tortious interference; proof of an expectancy, i.e., proof of prospective contractual relations, was enough. *Cook*, 700 S.W.2d at 528–29. There was ample

evidence in this record that Dr. Carter had reasonable expectations of future patient-physician relationships and prospective business relationships with other physicians and health care providers via patient referrals. This was all Dr. Carter had to prove to establish the first element of his tort claim.

In addition, Dr. Carter testified that two of his patients "transferred to another physician" after he was unable to get such patients' records from St. John's via use of the patients' written authorizations. This was evidence from which the jury could find that St. John's improperly interfered with Dr. Carter's *prospective* contractual relations with these two patients. Point III(A) is denied.

In Point III(C), St. John's argues that the third element of this tort, i.e., that St. John's lacked justification for its conduct, was not proven. The *Nazeri* case (cited above) explained that a plaintiff must show the defending party "employed improper means" in furthering his or her own interests. 860 S.W.2d at 317[3]. "In the context of this tort, improper means are those independently wrongful [and includes] ... any ... wrongful act recognized by statute or the common law." *Id.* In *Gott v. First Midwest Bank of Dexter,* 963 S.W.2d 432 (Mo.App.1998), this court said that justification to interfere with an expectancy to protect one's own economic interest could be shown " 'if his [or her] action was one which he [or she] had a definite *legal right* to take without any qualification.' " *Id.* at 439 (citation omitted) (emphasis supplied).

Here, St. John's claim that Dr. Carter failed to prove lack of justification focuses exclusively on its September 1997 change in policy regarding review of pathology slides. In that regard, St. John's advances multiple reasons on why it had "substantial justification for its policy requiring members of the medical staff to review pathology slides in the pathology department and for declining to release materials to [Dr. Carter] for review in his private office." [4]

Dr. Carter maintains that St. John's "misses the point" because he proved without contradiction that, beginning in 1997, St. John's often refused to send him medical records and slides of his patients, and these refusals occurred despite his patients' written authorization and request to St. John's for release of those items. He insists that the refusals were independently wrongful, that is, they were unjustified in that they violated state law, specifically § 191.227. [5]

Section 191.227 creates a right in patients to be furnished their medical records on request. *Wear v. Walker,* 800 S.W.2d 99, 103 (Mo.App.1990). [6] St. John's correctly notes that the § 191.227 duty to

4. St. John's put forth many reasons why its new policy was justified, but this court need not recount nor address those reasons as we find Dr. Carter proved lack of justification on other grounds.

5. All statute references are to RSMo (2000), unless otherwise indicated. All references to § 191.227 are to RSMo (1994).
 In pertinent part, § 191.227.1 provides:
 "1. All ... hospitals ... in this state ... shall, upon written request of a patient ... or legally authorized representative of a patient, furnish a copy of [its] record of that patient's health history and treatment rendered to the person submitting a written request, except that such right shall be limited to access consistent with the patient's condition and sound therapeutic treatment as determined by the [hospital]."

6. As the *Wear* court notes, § 191.227 does not afford a patient a specific remedy if his or her right to records is not honored; accordingly, aggrieved parties may resort to any common law action that will give them relief. *Id.* at 104.

provide records is one owed to patients and not Dr. Carter. Even so, we find that any breach by St. John's of this statutory duty would be a "wrongful act recognized by statute or by common law" within the contemplation of the *Nazeri* case and its progeny. The fact that Dr. Carter is not within the class of persons sought to be protected by § 191.227 does not mean St. John's was privileged to protect its own economic interest by violating the statute. This follows because such action, i.e., non-compliance with § 191.227, was not an action that St John's "had a definite legal right to take without any qualification." *Gott*, 963 S.W.2d at 439. To the contrary, it is conduct that is independently wrongful without regard to whether injury to Dr. Carter resulted from such interference. *Id.*

We find ample evidence in the record to support Dr. Carter's assertions, including multiple instances where a patient's signed request to St. John's pathology department that it provide Dr. Carter with his or her medical records including slides, was not honored. Dr. Carter testified that when his patients' requests for their medical records and slides were not honored, there were some he could not treat "effectively" and others sought treatment elsewhere. Such evidence was sufficient to submit to the jury the question of whether St. John's intentionally interfered with Dr. Carter's practice by "improper means" as that term is defined by *Nazeri* and its progeny. Point III(C) is denied.

In Point III(B), St. John's argues that Dr. Carter's evidence failed to establish the "causation" element of a claim for tortious interference. St. John's insists Dr. Carter failed to prove its acts induced or otherwise caused any third person not to enter or continue a prospective relation or keep Dr. Carter from acquiring or continuing a prospective relation with anyone.

To support its argument, St. John's cites *Fabricor*, 24 S.W.3d at 93–94 (explaining that the "but for" test is used to determine causation, namely (1) did interferer actively and affirmatively take steps to interfere, and (2) if so, would the contract have been performed or the business expectancy been realized absent the interference).

Relying primarily on *Fabricor*, St. John's argues that testimony by Dr. Carter that his patient referrals from other physicians had decreased (with no evidence to explain the decrease) was not sufficient to make a submissible case; that the jury could only "assume" that the decrease was caused by St. John's conduct; that any such assumption was not supported by the record; and the jury could only reach such a conclusion based on speculation and conjecture (which is not allowed). 24 S.W.3d at 94. St. John's then argues that Dr. Carter "did not provide any evidence to support the reasonable inference that [St. John's] conduct induced or caused a disruption of [Dr. Carter's] business relationship with his *patients or referring physicians*[;]" consequently, Dr. Carter did not make a submissible case and the trial court erred when it failed to sustain St. John's motion for directed verdict. (Emphasis supplied.)

St. John's is correct in its assertion that Dr. Carter did not prove a causal connection between St. John's unjustified conduct, i.e., refusal to honor medical-records release requests by Dr. Carter's patients, and the decline in patient referrals to Dr. Carter by St. John's physicians. The evidence does not show that "but for" St. John's failure to give Dr. Carter his patients' records per the patients' request, the twenty St. John's-affiliated doctors would have continued to refer a similar number of patients to Dr. Carter as before. This evidentiary gap is not filled from any source. None of the twenty

physicians who reduced their patient referrals testified, and Dr. Carter adduced no evidence from any other source about why the referrals significantly dropped. Moreover, there is no evidence from which it can reasonably be inferred that any of the twenty physician *knew* St. John's was not honoring the record release authorizations of Dr. Carter's patients. Accordingly, we need not and do not decide whether a causal connection might be found based on an inference that the decrease in patient referrals stemmed from concerns of St. John's-affiliated doctors that Dr. Carter could not promptly and efficiently get the referred patients' medical records from St. John's, and thus, the prospective patients' care and treatment might be compromised. To the extent Dr. Carter's interference tort claim is grounded on loss of physician referrals, it fails due to a lack of proof of a causal connection between St. John's refusal to honor patients' requests for their records and the reduction in St. John's physician referrals. *See Birdsong v. Bydalek*, 953 S.W.2d 103, 115 (Mo.App.1997).

■■■ Contrarily, we find there was sufficient evidence to show a causal connection between St. John's failure to honor certain patients' records authorizations and Dr. Carter's loss of patients (as contrasted with loss of referrals). Specifically, Dr. Carter testified there were instances when he used release forms signed by his patients to request their records, but St. John's did not honor the request. According to Dr. Carter, such refusals caused some of his patients to "transfer[ ] to another physician, because I wasn't able to do my job."

When viewed in the light most favorable to Dr. Carter, this is evidence from which the jury could reasonably infer that St. John's refusal to furnish records of cancer patients to the patients' treating physician would "move and lead" affected patients to find another physician, i.e., that St. John's actively and affirmatively took steps to induce Dr. Carter's patients to leave his care. Moreover, the evidence is sufficient for the jury to reasonably infer that the adversely affected patients who left his care would have continued with Dr. Carter absent St. John's refusal to provide him with the requested records. Accordingly, sufficient evidence existed to submit to the jury the question of whether St. John's induced or caused a disruption of Dr. Carter's business relations with *patients* (as opposed to interference with Dr. Carter's business relations with other physicians). Point III(B) is denied.

■■■ St. John's Point III(D) maintains that the fifth element of a business interference claim, i.e., damages, was not proven. It cites *Gesellschaft Fur Geratebau v. GFG America Gas Detection, Ltd.*, 967 S.W.2d 144 (Mo.App.1998), for the proposition that damages are an essential element of the claim, and if an interferee does not prove actual damages, his or her cause of action fails because an award of nominal damages cannot lie. *Id.* at 148. With that as its premise, St. John's argues that Carter did not make a submissible case because he failed to prove a loss of profits with the requisite reasonable certainty.

Dr. Carter, on the other hand, relies on *Rusk Farms, Inc. v. Ralston Purina Co.*, 689 S.W.2d 671, 681 (Mo.App.1985), to argue that once he proved all other elements of an intentional interference case, nominal damages are presumed; consequently, he argues that even if he failed to prove lost profits, the presumption of nominal damages plus proof of all other elements made a submissible case.

The two cited cases appear to be in conflict. As an aid to resolving this conflict, we consider *Coonis v. Rogers*, 429 S.W.2d 709 (Mo.1968), and *Tindall v. Holder*, 892 S.W.2d 314 (Mo.App.1994). In

*Coonis,* the Supreme Court of Missouri reversed a judgment favorable to an interferee for want of an evidentiary basis for procuring the breach of the interferee's contracts with its customers. After a detailed analysis of the burden an interferee bears in an interference case, the *Coonis* court reversed because the only proof of damages was that the interferer collected $750 from the interferee's customers (which was a gross, not a net figure). *Id.* at 714. Even so, the *Coonis* court remanded the case for retrial on the issues of the amount of damages to be awarded; it did not enter judgment for $1.00 nominal damages as was done in *Rusk.*

In *Tindall,* this court held that a plaintiff in a conspiracy to defraud case had to plead and prove pecuniary damages; that nominal damages would not be presumed.

"The [nominal damage concept] developed from the common law action for trespass for violence to person or property. [*Simpkins v. Ryder Freight System, Inc.,* 855 S.W.2d 416, 422[7] (Mo. App.1993)]. In such cases, the law simply presumes that damages are allowed. *Id.*

"Contrarily, nominal damages cannot be awarded in certain tort cases where pecuniary damages are an element of the cause of action. Why this division or distinction exists has been explained as follows: 'As the law of torts expanded by means of the action on the case to cover wrongs not characterized by violence and breach of the peace but by fraud, deceit, inattention, carelessness, and the like, more emphasis was placed upon the plaintiff's loss, and in certain of the wrongs which came to be remedied by actions on the case it was established that a vital and necessary element of the plaintiff's case was a showing of actual loss or detriment to him flowing from defendant's wrongful conduct. C.

McCormick, Handbook on the Law of Damages § 22 (1935).'"

*Id.* at 321[3,4].

Except for *Rusk,* Missouri courts have consistently held that pecuniary loss is an essential element of an action sounding in interference with contracts or business expectancy. *See Rice v. Hodapp,* 919 S.W.2d 240, 245 (Mo.banc 1996); *Nazeri,* 860 S.W.2d at 316; *Community Title Co.,* 796 S.W.2d at 372; *Birdsong,* 953 S.W.2d at 111. Guided by these cases, by *Coonis* and *Gesellschaft,* and based on the analysis in *Tindall,* we hold that proof of pecuniary loss was an indispensable element of Dr. Carter's tort claim. A presumptive award of nominal damages is not an option in deciding if Dr. Carter made a submissible case.

Earlier we ruled Dr. Carter did not prove a causal connection between St. John's wrongful act of not furnishing medical records upon written request of patients and the reduction in referrals. On the other hand, we found a causal connection between that act and the loss by Dr. Carter of certain patients. From that evidence, i.e., loss of patients, a jury could reasonably infer that Dr. Carter suffered damages. That, however, did not fully satisfy Dr. Carter's burden of proof. There had to be evidence sufficiently certain and definite to warrant the jury in estimating the *extent* of such loss. *Hargis v. Sample,* 306 S.W.2d 564, 569[5] (Mo. 1957); *Tnemec Co. v. North Kansas City Dev. Co.,* 290 S.W.2d 169, 174[4] (Mo.1956). "[D]amages need not be established with absolute certainty, but reasonable certainty is still required as to both *existence* and *amount* and the evidence must not leave the matter to speculation." *Haggard v. Mid–States Metal Lines, Inc.,* 591 S.W.2d 71, 77[9] (Mo.App.1979) (emphasis supplied). Here, Dr. Carter presented *no* evidence about losses he sustained when

his patients left his care due to St. John's conduct. Under the circumstances, any estimate by the jury of Dr. Carter's losses because of the departure of those patients could not be based on anything but speculation or conjecture.

■ In summary, no factual basis exists by which the jury could have estimated Dr. Carter's profit loss when patients left his care due to St. John's refusal to honor their requests for their records. Moreover, Dr. Carter never proved a causal connection between the decline in patient referrals from the twenty physicians and St. John's wrongful act. As such, there is an insufficient evidentiary basis to support the verdict of the jury. The portion of the judgment relating to the tort claim must be reversed.

When a party prevails at trial but the judgment is reversed on appeal, the preference is for remand for a new trial. *Moss v. National Super Markets, Inc.*, 781 S.W.2d 784, 786[3] (Mo.banc 1989). If a party asserting a claim, by mistake or inadvertence, fails to present sufficient evidence at trial to prove his or her claim, in a situation where the proof appears available, the case should be remanded to allow the introduction of additional evidence. *In re Estate of Mapes*, 738 S.W.2d 853, 856[7] (Mo.banc 1987). We conclude from this record that these principles have application; consequently, remand of the tort claim will be ordered.

### Point IV: Evidence Of St. John's Revenues And Net Worth

■ St. John's fourth point maintains the court committed reversible error when it allowed Dr. Carter to introduce evidence of St. John's net worth, gross revenues, and assets. St. John's claims the challenged evidence was "irrelevant and prejudicial when [Dr. Carter] failed to establish a submissible case for punitive damages." In the argument beneath Point IV, St.

John's made the additional complaint that the described evidence was "inflammatory."

Initially, we note that St. John's has not properly preserved the complaints it makes about this evidence. This follows because St. John's arguments to this court about why evidence relating to its net worth and earnings were inadmissible are, for the most part, different from those made to the trial judge. Specifically, St. John's objections to Dr. Carter's testimony on this subject were that the question called for "speculation," "self-serving testimony," and testimony without "foundation," whereas St. John's now attacks the testimony on the ground that it was "irrelevant," "inflammatory," and "prejudicial." As to exhibit 122 (St. John's tax returns), St. John's at-trial objections were that (1) there is "[*n*]o *foundation for this,*" (2) it is "*irrelevant* [*,*]" (3) it is "*outside the scope of the pleadings* [*,*]" and (4) exhibit 122 had not previously been listed as a "party admission" as required by pre-trial discovery orders. (Emphasis supplied.)

■ "To preserve evidentiary questions for appeal, there must be an objection giving the grounds at the time the evidence is sought to be introduced and the same objection must ... then [be] carried forward in the appeal brief." *Rogers v. B.G. Transit Corp.*, 949 S.W.2d 151, 153[1] (Mo.App.1997). Grounds for excluding evidence that are not stated in an objection are waived, and a party may not advance on appeal an objection to evidence different from the one made to the trial court. *Firestone v. Crown Ctr. Redevelopment Corp.*, 693 S.W.2d 99, 107 (Mo.banc 1985); *Rogers*, 949 S.W.2d at 153[4]. Nor may a party broaden or change the breadth of the objection on appeal. *Id.*

■ Moreover, an objection is ordinarily adequate only if it is made with suffi-

cient specificity to inform the trial court why the objector claims the challenged evidence should be excluded. *Cole v. Goodyear Tire & Rubber Co.*, 967 S.W.2d 176, 183[2], (Mo.App.1998); *Rogers*, 949 S.W.2d at 153. The rule requiring specificity in objections serves to ensure that the trial judge knows the reasons for an objection so he or she can make informed and wise rulings on the objection, *Chism v. Steffens*, 797 S.W.2d 553, 559 (Mo.App. 1990), and allow the judge and opposing counsel to take any corrective action needed before the case is given to the jury. *See Keller v. Anderson Motor Serv., Inc.*, 652 S.W.2d 735, 737 (Mo.App.1983).

In applying the "specificity" rule, Missouri appellate courts have ruled that general objections such as "lacks a foundation," "irrelevant," "calls for speculation," "is self serving," and the like, are not sufficiently specific objections. *See, e.g. Missouri Pipeline Co. v. Wilmes*, 898 S.W.2d 682, 687 (Mo.App.1995) (holding "lack of foundation" too general); *Blount v. Peipers*, 864 S.W.2d 392, 393[3] (Mo. App.1993) (holding bare objection on grounds of "irrelevancy without explaining why the evidence was irrelevant[ ]" too general to preserve error); *Meadows v. Kinser*, 603 S.W.2d 624, 626[4] (Mo.App. 1980) (holding objection that proffered exhibit was "self-serving instrument" was neither a sufficiently specific objection nor did it contain proper ground for excluding evidence).

Guided by these principles, we find St. John has not properly preserved the issues of the admissibility of the questioned evidence for appeal.[7]

Even so, we consider the question of whether allowance of the evidence was plain error.[8] We answer that question, "No." First, we note St. John's could easily have avoided this issue by requesting a bifurcated trial as it was entitled to do per § 510.263.1. Under § 510.263.2, evidence of an alleged tortfeasor's net worth is ordinarily inadmissible in the first stage of a two-stage case. St. John's opted against a bifurcated trial by not requesting such. We do not speculate on whether this was a conscious effort by St. John's to invite error into the case. It is clear, however, that when Dr. Carter proffered his "net worth" evidence, no second stage trial had been ordered because it had not been requested; consequently, the only opportunity Dr. Carter had to place before the jury evidence of St. John's net worth was in his case-in-chief. Ordinarily, a party cannot complain on appeal about a procedure adopted in the trial court at his or her own request, nor may an appellant complain of alleged error, which by such person's conduct at trial, he or she joined in or acquiesced or invited. *Schroeder v. Lester E. Cox Medical Ctr.*, 833 S.W.2d 411, 424 (Mo.App.1992). That rule attends here and precludes any finding of manifest injustice or miscarriage of justice resulting from the admission of the "net worth" evidence.

7. In so holding, we acknowledge that the attrial objections to exhibit 122 (tax return) included a claim that it was "irrelevant" and St. John's advances that same argument on appeal. However, St. John's never explained to the trial judge why that evidence was not relevant; consequently, the objection preserved nothing for appeal. *Blount*, 864 S.W.2d at 393[3]; *Gilliam v. City of St. Louis*, 766 S.W.2d 172, 174[3] (Mo.App.1989).

8. Rule 84.13(c), Supreme Court Rules (2002), provides that "[p]lain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

Further, after the court ruled it would not submit Dr. Carter's claim for punitive damages to the jury, St. John's requested and the court gave a written withdrawal instruction. The instruction read: "The evidence of St. John's net worth, gross revenues and assets is withdrawn from the case and you are not to consider such evidence in arriving at your verdict."

■ The purpose for a withdrawal instruction is to avoid misleading the jury on a specious issue. *Bradley v. Browning–Ferris Industries, Inc.,* 779 S.W.2d 760, 765[7] (Mo.App.1989). "In the absence of exceptional circumstances, appellate courts assume that a jury obeys a trial court's directions and follows its instructions." *Stalcup v. Orthotic & Prosthetic Lab,* 989 S.W.2d 654, 659[14] (Mo.App.1999). Giving of the withdrawal instruction here confirms this court's view that neither manifest injustice nor miscarriage of justice resulted from the admission of financial information about St. John's. Point IV denied.[9]

### Point VII: Instruction Issue on Breach of Contract

■ In Point VII, St. John's alleges the court erred when it submitted to the jury Instruction No. 12, patterned after MAI 26.06, because the instruction did not "hypothesize all of the essential elements" of a breach of contract. In the argument section, St. John's begins by setting forth the instruction. The following is a verbatim recital of St. John's first argument under this point:

> "Instruction No. 12 is based on MAI 26.06, which submits a claim for breach of a bilateral contract. However, Instruction No. 12 fails to set forth all of the essential elements of a bilateral con-

tract and plaintiff improperly modified paragraph Third of Instruction No. 12, making this portion of the instruction vague and ambiguous. This instruction also fails to set forth the essential elements which the jury was required to find in order to determine whether the agreement in question had been created and then breached."

■ The foregoing shows that St. John's has wholly failed to preserve this issue (whatever it may be) for appellate review. If a party fails to support a contention with relevant authority or argument beyond mere conclusions, the point is considered abandoned. *Beatty v. State Tax Comm'n,* 912 S.W.2d 492, 499[17] (Mo. banc 1995). We deem the first part of St. John's Point VII to be abandoned.

■ In the second part of its Point VII argument, St. John's claims the instruction "omits an essential element of [Dr. Carter's] alleged cause of action and allowed the jury to return a verdict on this claim without deciding whether Mr. Hammer had the authority to enter into the agreement which was disputed between [Dr. Carter] and [St. John's]." This claim is unpreserved because St. John's did not specifically object at trial to instruction 12 on the grounds now asserted on appeal. At trial, the objection was:

> "I don't believe [Instruction 12] actually sets forth the facts in dispute or the facts claimed by plaintiff or the law. Paragraph first says that plaintiff and defendant entered into agreement whereby plaintiff agreed to join defendant's medical staff. I don't think the evidence supports that. Plaintiff applied for membership, but it wasn't a situation

---

**9.** We need not address Points V and VI. This follows because they urge reversal of the tort claim which we reversed under Point III.

where he agreed to join it. I think that's an improper submission."

Rule 70.03, Supreme Court Rules (2001), mandates that "[c]ounsel shall make specific objections to instructions considered erroneous." It also provides that "[n]o party may assign as error the giving [of an] ... instruction[ ] unless that party objects thereto before the jury retires to consider its verdict, stating *distinctly* the matter objected to and the grounds of the objection." (Emphasis supplied.)

Because St. John's complaint on appeal about instruction 12 was never made at trial, the propriety for giving the instruction has not been preserved for our review. *Daniels*, 51 S.W.3d at 11; *Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d 404, 419[1] (Mo.App.1999); *Burnett v. Thrifty Imports, Inc.*, 773 S.W.2d 508, 512[4] (Mo. App.1989). As Point VII does not seek plain error review and is not otherwise preserved, it is denied.

### Points VIII and X: Duplicative Damages Issue

In Point VIII, St. John's charges the trial court erred when it denied St. John's new trial motion because instructions 9, 10, 13, and 14 allowed the jury to award damages that were duplicative. Specifically, St. John's argues that the damages proven for the contract and tort counts were the same in that Dr. Carter "made no effort to prove that separate damages flowed from each alleged cause of action." In Point X, St. John's makes essentially the same argument, and requests this court to vacate the judgment and enter a new or amended judgment of no more than $1.5 million to reflect a merger of the damages awarded under both counts. However, we need not decide this duplicate damage question be-

cause we are reversing the judgment for tort damages.

This court does not know if the tort count will be retried, nor do we know what the damages would be if Dr. Carter prevailed. Under the *circumstances*, any analysis or opinion on this issue could only be based on speculation and would be entirely advisory in nature. Appellate courts do not render advisory opinions or decide nonexistent issues. *Meco Systems, Inc. v. Dancing Bear Entertainment, Inc.*, 42 S.W.3d 794, 809[29] (Mo.App.2001). Points VIII and X are denied.

### Point IX: Claims That Verdict Amounts Were Excessive

St. John's ninth point complains the trial court erred when it did not grant a new trial based on its claim that the jury's verdict on the contract count was excessive. Alternatively, it charges the trial court erred when it refused to order remittitur.[10] The common thread is an assertion that the jury verdict on the contract count was "grossly excessive."

A contention that a jury verdict is excessive, standing alone, does not entitle a defendant to appellate relief. *Elfrink v. Burlington Northern Ry. Co.*, 845 S.W.2d 607, 614[16] (Mo.App.1992). A defendant must show that an allegedly excessive verdict in fact stemmed from bias and prejudice on the part of the factfinder. *Id.* To carry that burden, a defendant must show that the verdict was "glaringly unwarranted" by the evidence and that some trial error or misconduct by the plaintiff was responsible for prejudicing the jury against the defendant. *Id.* If a defendant can establish bias and prejudice, then the

---

10. Although St. John's ninth point complains that the judgment on both the contract count and tort count are "grossly excessive," we only address the point as it relates to the

contract count. This follows because we have reversed that part of the judgment attributable to the tort claim.

jury is guilty of misconduct that vitiates the entire verdict. *Id.* at 614[17]. Under such circumstances, a reviewing court can reverse and remand for a new trial. *Id.*

Initially, we note that St. John's arguments about what allegedly created jury bias or prejudice against it are non-persuasive. In conclusory fashion, St. John's complains that admission of Exhibit 16 (a reproduction of § 191.227 RSMo 2000); admission of St. John's tax return (exhibit 122); admission of Dr. Carter's testimony regarding St. John's financial status and assets; allowing Dr. Carter to testify regarding the need for a punitive damage judgment to get St. John's attention; and unspecified, unidentified closing arguments, were "inflammatory and designed to incite the passion, bias and prejudice of the jury."

St. John's does not explain, however nor can this court discern, how putting a copy of § 191.227 in evidence would "incite the passion, bias and prejudice of the jury."[11] As to the punitive damage evidence, we have already explained why St. John's is in no position to complain about it, i.e., St. John's chose not to seek bifurcation, and thus, acquiesced in the proffer of such evidence. Moreover, St. John's never properly preserved the objections it did make to such evidence. As to the generation of prejudice and bias via closing argument, St. John's fails to inform this court where we might find such remarks. If St. John's cannot figure out what argument incited the alleged bias or prejudice, this court cannot do so.

We also note that St. John's does not analyze or develop an argument on why it claims the jury verdict on the contract count was excessive. It simply states, repeatedly and in conclusory fashion, that the $1,000,000 verdict was grossly "dispro-portionate to any damages remotely supported by [Dr. Carter's] evidence[,]" "glaringly unwarranted[,]" "grossly excessive[,]" and against "the weight of the evidence." We disagree.

Dr. Carter testified, that before 1997, approximately 48 percent of his practice was "associated with St. Johns[,]" whereas the three and one-half-year period before trial, his practice at St. John's had essentially "ceased to exist." Richard Leib ("Leib"), who worked in Dr. Carter's billing department, testified about a comparative analysis he made of Dr. Carter's bone marrow practice, both before and after the alleged breach of contract in October 1997. From that analysis, Leib estimated Dr. Carter's losses at something over $2.3 million (gross income) for the period 1997 through 2000. Although this was a gross income figure, the jury was provided with evidence from which it could have found Dr. Carter's "variable expenses as a percent of revenue" averaged 48 percent for the years 1996 through 1998. The foregoing was sufficient substantial evidence from which the jury could find Dr. Carter had net profit losses of more than a million dollars from 1997 through the trial date because of his loss of St. John's as a bone marrow patient source. Not only has St. John's failed to show trial error that would have prejudiced the jury, it does not persuade us that the verdict was excessive. As such, there was ample support for the trial court's refusal to grant St. John's a new trial.

 Regarding St. John's remittitur argument, we note that a trial court has broad discretion when considering the entry of a remittitur order, and "its decision whether or not to reduce damages will not be disturbed on appeal absent an

---

11. Section 191.227.1 mandates release by medical providers of their patients' records upon written request of the patient or legally authorized representative thereof. *See* n. 6.

abuse of discretion so grossly excessive that it shocks the conscience and convinces this court that both the trial judge and the jury have abused their discretion." *King v. Unidynamics Corp.*, 943 S.W.2d 262, 268[18] (Mo.App.1997). Appellate courts exercise their power to interfere with the judgment of the jury and trial judge with caution, and then only where the verdict is manifestly unjust. *Id.* at 268[19].

We have already explained that there was sufficient substantial evidence to support the jury's award on the contract count; consequently, the verdict was not manifestly unjust and the trial court did not abuse its discretion when it refused to order remittitur. Point denied.

### Point XI: Offset For Amount Paid To Alleged Joint Tortfeasor

In Point XI, St. John's alleges the trial court erred when it refused to reduce the judgment by $40,000. This is the amount received by Dr. Carter before trial per a settlement with co-defendants Ferguson and two of Ferguson's doctors. St. John's argues that § 537.060 mandates that it be given credit for the settlement amount. However, our reversal of the tort claim (Point III) renders this point moot. This follows because § 537.060 deals exclusively with tort claims. It mandates judgment reduction when other "persons *liable in tort* for the same injury" have, in good faith, paid the injured party and been released. (Emphasis supplied.) Because § 537.060 does not entitle St. John's to credit against that part of the judgment representing damages for breach of contract and because we reversed that part of the judgment that was for tort damages, § 537.060 is not implicated. Point denied.

### DR. CARTER'S APPEAL—
### Case No. 24248

Dr. Carter's first point maintains the trial court erred when it refused to submit his punitive damage claim in connection with his interference count. However, we have already found that Dr. Carter did not make a submissible claim on his tort claim because of his failure to prove damages. We further ruled that nominal damages were not an option in a tortious interference case. Under the circumstances, Dr. Carter was not entitled to an award of punitive damages, *Tindall*, 892 S.W.2d at 322, and no error resulted from the trial court's refusal to submit that issue to the jury. Point I is denied.

In his second point, Dr. Carter complains reversible error resulted when the jury was not instructed it could consider punitive damages in his contract count. Although Dr. Carter concedes the general rule to be that punitive damages are not recoverable in a contract case, *Peterson v. Continental Boiler Works, Inc.*, 783 S.W.2d 896, 902 (Mo.banc 1990), he maintains that he plead and proved an exception to this rule, i.e., that punitive damages are recoverable in a contract case "where the breaching party's conduct, apart from an intentional breach of the contract, amounts to a separate, independent tort." *Id.* at 903.

In his sixth amended petition, Dr. Carter alleged, *inter alia:*

"8. That on ... October 14, 1997 ... St. John's notified [Dr. Carter] ... that [his] right to officially report bone marrows had been ... revoked.

"9. That ... St. John's actions constituted a breach of contract.

"10. That [St. John's] actions constituted an intentional interference with [Dr. Carter's] practicing his profession and *was without justification.*

. . . .

"12. That the conduct of ... St. Johns was outrageous because of ... evil motive or reckless indifference to the rights

of others and showed complete indifference ... for the safety of others, thereby subjecting [St. John's] to punitive damages...." (Emphasis supplied.)

The trial court, in refusing to submit Dr. Carter's punitive damage instruction, found "as a matter of law there is no clear or convincing evidence as to the issues of punitive damages." We agree and find no error in the trial court's ruling. This follows because St. John's notification to Dr. Carter on October 14, 1997, that he could no longer report on bone marrows was not done "without justification." To the contrary, St. John's was entitled to cancel their contract at any time because of the contract's indefinite period. *Albers*, 729 S.W.2d at 523; *Benson*, 706 S.W.2d at 217. *See* n. 3. Point II is denied.

We affirm that part of the judgment awarding Dr. Carter $1,000,000 on his contract count; we find no error in the trial court's refusal to submit Dr. Carter's punitive damage claim to the jury on the contract count; we reverse that part of the judgment awarding Dr. Carter $1,500,000 on his tort claim and remand for further proceedings.

MONTGOMERY, J., and BARNEY, C.J., concur.

### OPINION ON MOTION FOR REHEARING OR TRANSFER

Pursuant to Rule 84.17 and Rule 83.02, St. John's asks that we rehear this appeal, or alternatively, to transfer the cause to the Supreme Court of Missouri. In its motion, St. John's claims, *inter alia*, this court "misconstrued the record" when it relied on a document allegedly dated *August 18, 1983,* to find there was substantial evidence that St. John's board had full knowledge of "the material facts of [Hammer's] transaction" with Dr. Carter. St. John's insists that the referenced docu-

ment was dated *March 18, 1983,* and was prepared before Dr. Carter had his June 1983 discussion with Hammer that led to his claim of a contract right to report on bone marrows. As such, St. John's argues there was "no evidence that the board of directors took any action on August 18, 1983, approving Carter's request for privileges to officially report bone marrow studies."

The document in question was a "Staff Membership Approvals" form which referred to an "accompanying delineation of privileges form." These documents, mentioned in the first point of the opinion, were in evidence as defendant's (St. John's) Exhibits 203 and 202, respectively. Exhibit 203 is shown as Appendix "A" attached hereto. In the lower left-hand corner is a hand-written date that appears to be *8/18/83* rather than *3/18/83* as St. John's contends. The only delineation of privileges form in evidence for 1983 contains Hammer's notation regarding his agreement with Dr. Carter concerning bone marrow reporting.

However, even if Exhibit 203 (the "Staff Membership Approvals" form) was generated, dated, and signed by St. John's board secretary on March 18, 1983, the outcome would remain unchanged. This court remains persuaded there was sufficient substantial evidence in this record (without considering Exhibit 203) that St. John's board had full knowledge of "the material facts of [Hammer's] transaction" with Dr. Carter; namely, that Hammer had contracted on behalf of St. John's for Dr. Carter to report on bone marrows performed by him at St. John's Hospital.

The additional arguments and claims made in St. John's motion for rehearing or to transfer were considered and disposed of in our original opinion. St. John's motion for rehearing or, in the alternative, for

transfer to the Supreme Court of Missouri
are denied.

St. John's Regional M___ cal Center,
Joplin, Missouri

DEFENDANT'S
EXHIBIT
203
ALL-STATE® INTERNATIONAL

STAFF MEMBERSHIP APPROVALS

Name of Applicant:___ROBERT L. CARTER, M.D._____

RECOMMENDATION: DEPARTMENT OF ___MEDICINE & FAMILY PRACTICE_____

 Approve___✓___ Comments:_____

 Disapprove_____ _____

 Recommended Staff Category ___Associate_____

Date:___1-24-83___ Signature of Chairman _Michael D_____
 M. D. Nickell, M.D.

RECOMMENDATION: CREDENTIALS COMMITTEE

 Approve___✓___ Comments:_____

 Disapprove_____ _____

 Recommended Staff Category ___Associate_____

Date:___1-27-83___ Signature of Chairman _____

RECOMMENDATION: EXECUTIVE COMMITTEE

 Approve___✓___ Comments:_____

 Disapprove_____ _____

 Recommended Staff Category ___ASSOCIATE_____

Date:___2-1-83___ Signature of Secretary _____

The BOARD OF DIRECTORS of St. John's Regional Medical Center, Joplin, Missouri, appoints the above-named physician to the Medical Staff for the year _1983_ in the Department requested and with privileges as denoted on the accompanying delineation of privileges form.

 Approve___✓___ Comments:_____

 Disapprove_____ _____

Date:_3/18/83_ Signature of Secretary ___Sigma Mueller___

APPENDIX "A"